Second Division

June 23, 1998

No. 
1-97-2267

BRIAN DAVIS,

Plaintiff-Appellant,

v.

TIMES MIRROR MAGAZINES, INC., MICHAEL ROONEY, JOHN MARQUARDT, GEORGE BELL and GEORGE MOSKOWITZ,

Defendants-Appellees.

)

)

)

)

)

)

)

)

)

)

)

Appeal from the

Circuit Court of

Cook County.

Honorable

David Lichtenstein,

Judge Presiding.

JUSTICE TULLY delivered the opinion of the court:

Plaintiff, Brian Davis, brought this action against defendants, Times Mirror Magazines, Inc. (TMM), Michael Rooney, John Marquardt, George Bell and George Moskowitz, for retaliatory discharge, breach of contract, tortious interference with contract and civil conspiracy.  Plaintiff alleged that TMM, his employer, terminated him in retaliation for not participating in smoking marijuana with fellow employees and for later reporting the marijuana incident to his supervisors.  Plaintiff also alleged that the individual defendants intentionally interfered with his employment contract and conspired with TMM to terminate his employment.  Defendants filed motions for summary judgment on those claims pursuant to section 2-1005 of the Illinois Code of Civil Procedure (735 ILCS 5/2-1005 (West 1994)), which the trial court granted.  Plaintiff appeals the trial court's order pursuant to Supreme Court Rule 301 (155 Ill. 2d R. 301).

For the reasons which follow, we affirm.

FACTUAL BACKGROUND

TMM, a magazine publishing company, employed plaintiff in its Chicago office in a magazine advertising sales position for over seven years.  TMM issued an employee handbook which stated in pertinent part that "[t]here will be no reprisals as a result of your exercising your right to have your complaint heard and investigated."  The handbook also stated in the introduction that:

   "This booklet is designed as a general guide to the policies and procedures that relate to your employment at TMM.  It does not, and is not intended to, cover every detail or situation that may arise.  Certain occasions and situations may require actions apart from the policies contained herein.  These will be regarded as exceptions to policy and may be made at management's discretion.  
THE COMPANY EXPRESSLY RESERVES THE RIGHT TO AMEND, MODIFY OR DELETE ANY PROVISIONS, POLICIES OR BENEFITS AT ANY TIME AND WITHOUT NOTICE.

By accepting employment with TMM, each employee agrees that he or she understands that the employment relationship is 'At Will'.  Simply stated, this means that an employee has the right to terminate his or her employ whenever he or she wishes and for whatever reason and the company has the same right to dismiss any employee at any time, with or without cause."  (Emphasis in original.)  

Plaintiff sold advertising for 
Field & Stream
 and 
Outdoor Life
 (FS/OL) magazines.  In April 1993, TMM congratulated plaintiff in a company newsletter for his successful level of sales and for being cited in an industry survey of advertising executives as one of the salesmen "consider[ed] to be the best in terms of attentiveness, knowledge about product[s]/service[s], professionalism, etc."  In May 1993, TMM thanked plaintiff and other employees in a company newsletter for their "extra effort" in meeting a deadline.  In June 1993, TMM complimented plaintiff's sales proposals and sent examples of them to its sales staff for them to use as a format for their proposals.  In addition, plaintiff's performance evaluations reflected that he met or exceeded most of his job expectations.  The evaluations contained positive comments as well as suggestions for improvement.  

In the beginning of 1994, FS/OL's sales were decreasing.  TMM's President named Bell as "Senior Vice President, Group Publisher" for the magazines.  Bell's job was to increase profitability, bring stability to the magazines, and to improve their reputations.  Bell replaced the magazines' existing publisher with Rooney in March 1994.  Rooney discussed the magazines' lack of performance with Bell, and in response Bell informed Rooney that significant organizational changes might be necessary.  In addition, the advertising manager and marketing director advised Bell and Rooney of an immediate need to improve the declining sales in the Chicago Midwest Regional Sales Office.  In March 1994, Rooney met with the Chicago office staff to evaluate them.  Rooney evaluated Curt Costin, the Regional Sales Manager, and determined that he lacked the necessary management skills and found that Beth Lofchie, the Regional Marketing Manager, lacked direction.  Rooney also went with plaintiff to a sales appointment, and found plaintiff to be "off track."  According to Rooney, plaintiff made ineffective sales presentations and improperly spent time on market research, which was the responsibility of the marketing group.  Rooney believed that plaintiff did not spend enough time making sales calls.  Costin's March 1994 employee performance appraisal of plaintiff stated that he was a valued salesperson and solid performer over the years.  The appraisal, however, also stated that "[plaintiff] can increase his effectiveness as a salesperson by modifying his work ethic regarding the quantitative aspect of his business," that "[he] must increase call volume and activity in his territory," and that "[b]etter planning, time management, and completion of required tasks (i.e., client follow-up, call reports) will help him increase his effectiveness."   Rooney discussed a reorganization of the Chicago office with Costin, whom he wanted to demote to a sales position.  Rooney also informed Costin that he wanted to eliminate Lofchie's position.  Costin resigned in May 1994.  Lofchie was terminated in June 1994.  Rooney hired John Marquardt to replace Costin, and delegated to him the responsibility of evaluating the Chicago staff.  Meanwhile, Rooney reorganized the top level management staff in the New York office.

At the end of Marquardt's first week in June 1994, he spoke to plaintiff about his behavior.  Specifically, Marquardt criticized plaintiff for not coming into the office regularly, only making a few office calls, and dressing in casual attire.  Marquardt met with plaintiff again that month and discussed the need to improve sales in the Chicago office and what plaintiff could do to meet Marquardt's expectations.  They discussed the situation again on July 18, 1994, when Marquardt told plaintiff that he did not think that he understood the severity of the decreased sales in his territory, and that his lack of sales calls and casual dress did not indicate a willingness to improve.  Plaintiff acknowledged his need for improvement.   

The sales and marketing staff of FS/OL met for a conference at the Doral Resort and Conference Center in New York from July 20 to 22, 1994.  On the second night of the conference, most of the staff members were on a large patio talking and drinking cocktails.  Rooney, Marquardt and plaintiff were there.  Someone lit a marijuana cigarette and passed it to Rooney, who smoked some of it and passed it on to another person.  Several staff members smoked the marijuana.  According to plaintiff, Rooney offered him and two other people the marijuana and plaintiff refused it.  Rooney denied doing so.  Plaintiff stated that he did not smoke marijuana during the Doral conference, but he had smoked marijuana one time in the past, with a TMM coworker.  No one stated that they saw Marquardt smoke the marijuana, and Marquardt denied that he smoked it.  Bob Hanna stated in his deposition that he saw Marquardt handle the marijuana cigarette, but he did not see him smoke it.      

On July 28, 1994, Marquardt met with plaintiff again, and told him that he was still failing to meet Marquardt's expectations, and asked plaintiff to reorganize his office and to give him an outline of an upcoming sales presentation.  He also asked plaintiff to take the weekend to consider whether he could give "100 percent" to his job.  The following week, plaintiff told Marquardt that he was willing to improve, but he did not complete the presentation outline or organize his office.

In late July or early August 1994, Marquardt called George Moskowitz, the Director of Human Resources, to discuss his concerns with plaintiff's performance and to seek advice on disciplinary procedures.  On August 8, 1994, Marquardt sent a memorandum to TMM's Human Resources Department at Moskowitz' suggestion, in which he concluded the following:

"In my opinion, [plaintiff is] unwilling to change his behavior and is resistant to my direction.  He has not responded to even the most simple requests.  I feel his lack of organizational skills, communication skills, [and] overall demeanor, is a negative, distractive element in the Midwest office.  He has so many things to improve upon, I cannot foresee him to do enough to improve his performance."  

Moskowitz then advised Marquardt that there was a sufficient basis to terminate plaintiff's employment.  Moskowitz informed Marquardt that plaintiff's personnel file showed some similar performance problems in previous performance evaluations.  Marquardt told Rooney and Paul Turcotte, the Advertising Director, that he wanted to terminate plaintiff but that he wanted to maintain continuity and coverage in the office until he found a replacement for plaintiff.  Rooney and Turcotte left the decision of when to terminate plaintiff up to Marquardt. 

Marquardt hired a new sales representative, Mark Flaharty, to replace plaintiff in late September 1994.  Flaharty began working at TMM on October 10, 1994.  On October 6, 1994, after learning about Marquardt's August 8 memorandum, plaintiff sent a letter to Moskowitz which read in pertinent part:

"As head of Human Resources, I thought you should know about an incident that took place at a recent corporate function and how I think it became a problem for me.

In front of a large group of TMM employees and other senior executives, I was asked at least twice by one of the senior executives at FS/OL to join a group who were smoking marijuana.  Both times I refused to participate.

 In as much as I count on this memo remaining confidential, the anxiety and stress associated with coming forward with this type of information has made me very apprehensive up to this point.  I now feel compelled however to come forward with these details because it's my strong belief that I am being unjustly penalized for not participating with this individual.  

It would be extremely disheartening to think that this event is affecting my employment and good reputation with TMM in any way whatsoever.  Based on my exceptional sales history over the past seven years in addition to the very positive feedback I've received during my employment, it is hard for me to comprehend that my value and status in this organization could come into question."            

When Moskowitz received the letter, he did not totally dismiss the charges in the letter, but thought that plaintiff was trying to set up TMM.   He knew of plaintiff's "performance problems" and thought that he was trying to protect himself from being terminated.

After Bell learned of rumors about the marijuana smoking incident in October 1994, Rooney explained to him that marijuana had been used at the Doral conference.  Bell informed Rooney that TMM would require everyone who smoked marijuana at the conference to come forward to receive drug counseling and that no one would be fired unless there was another such incident.  

The entire sales staff was required to attend a national sales meeting in New York during the week of October 18.  At the sales meeting, Rooney acknowledged that he smoked marijuana during the Doral conference and apologized.  He asked everyone else who smoked marijuana at the conference to come forward, and referred to the importance of "trust, understanding and honesty" among members of the team.  Rooney also stated that someone in the group had "undermined" or "betrayed" the group's efforts.  Plaintiff stated that Rooney looked directly at him when he made that statement.

After the sales meeting, Marquardt met with Rooney and told him that he was upset with plaintiff for missing the scheduled flight to New York for the sales meeting, and for failing to meet him in New York as scheduled.  He called this "the final straw."  Marquardt stated that it was time to terminate plaintiff.  In his deposition, Marquardt later explained, "[t]he pot smoking incident and everything else about that was none of my business and had absolutely nothing to do with my anger."

On October 26, 1994, plaintiff sent a memo to Francis Pandolfi, a TMM manager, which stated that plaintiff was the person who reported the marijuana usage at the Doral conference and that he was ordered to attend a meeting with his manager the next day.  Plaintiff also wrote "[a]lthough the content of the meeting has not been described to me, I have a sense that a retaliatory motive is the reason for the meeting."  Pandolfi told Bell to investigate the allegation in plaintiff's memo.  Bell spoke with plaintiff and Moskowitz, and concluded that Marquardt's recommendation to terminate plaintiff was not related to the Doral conference incident or to plaintiff's reporting of the incident.  Pandolfi stated that he understood that the reason for the termination was plaintiff's poor sales performance, and that Bell and Rooney should disregard the fact that plaintiff might try to say that his termination was in retaliation.  Plaintiff was terminated on November 3, 1994.       

 

ISSUES PRESENTED FOR REVIEW

On appeal, plaintiff argues that the trial court erred in granting defendants' motions for summary judgment on his retaliatory discharge, breach of contract, tortious interference with contract and civil conspiracy claims.

OPINION

Plaintiff first contends on appeal that the trial court erred in granting summary judgment for TMM on the retaliatory discharge claim.  Summary judgment motions permit the trial court to determine whether any genuine issue of material fact exists in the action, and if not, to provide an expedient means of resolution.  
Purthill v. Hess
, 111 Ill. 2d 229, 489 N.E.2d 867 (1986).  Summary judgment is an appropriate remedy if the pleadings, depositions and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact.  
White v. U.S. Fidelity & Guaranty Co.
, 21 Ill. App. 3d 588, 316 N.E.2d 131 (1974).  When deciding the motion, the trial court should construe all of the evidence before it strictly against the movant.  
Reed v. Bascon
, 124 Ill. 2d 386, 530 N.E.2d 417 (1988).  While summary judgments are to be encouraged in the interest of prompt disposition of lawsuits, they are a drastic measure; consequently, trial courts should grant such judgments only where the movant's right is so clear as to be free from doubt.  
Bascon
, 124 Ill. 2d at 393, 530 N.E.2d at 420; 
Purthill
, 111 Ill. 2d at 240, 489 N.E.2d at 871.  Under Supreme Court Rule 191 (134 Ill. 2d R. 191), evidentiary materials filed in support or in opposition to a motion for summary judgment must be based on "personal knowledge" and "shall not consist of conclusions but of facts admissible in evidence."  "Although a plaintiff opposing a motion for summary judgment need not prove [his or] her case at this point, [he or] she must provide some factual basis which would arguably entitle her to a judgment under the applicable law."  
In re Estate of Sewart
, 236 Ill. App. 3d 1, 8, 602 N.E.2d 1277, 1281 (1991).  Furthermore, "[u]nsupported assertions, opinions, and self-serving or conclusory statements made in deposition testimony are not admissible evidence upon review of a summary judgment motion."  
Larson v. Decatur Memorial Hospital
, 236 Ill. App. 3d 796, 802, 602 N.E.2d 864, 869 (1992).  Our review of a grant of summary judgment is 
de
 
novo
.  
Myers v. Health Specialists
, 225 Ill. App. 3d 68, 587 N.E.2d 494  (1992).

The common law tort of retaliatory discharge was first recognized in Illinois as a cause of action in 
Kelsay v. Motorola, Inc.
, 74 Ill. 2d 172, 384 N.E.2d 353 (1978).  A retaliatory discharge tort is a limited and narrow exception (
Wieseman v. Kienstra, Inc.
, 237 Ill. App. 3d 721, 604 N.E.2d 1126 (1992)) to the general rule which states that all employment is at will and that an employer may discharge an employee for any or no reason.  
Spann v. Springfield Clinic
, 217 Ill. App. 3d 419, 577 N.E.2d 488 (1991).  A valid claim of retaliatory discharge must contain allegations that (1) the plaintiff was discharged; (2) the discharge was in retaliation for plaintiff's activities; and (3) the discharge violates a clear mandate of public policy.  
Dudycz v. City of Chicago
, 206 Ill. App. 3d 128, 563 N.E.2d 1122 (1990), citing 
Hinthorn v. Roland's of Bloomington, Inc.
, 119 Ill. 2d 526, 519 N.E.2d 909 (1988).  Public policy is to be found in our State constitution, statutes and judicial decisions (
Palmateer v. International Harvester, Co.
, 85 Ill. 2d 124, 421 N.E.2d 876 (1981)) as well as in Federal statutes (
Johnson v. World Color Press
, 147 Ill. App. 3d 746, 498 N.E.2d 575 (1986)). 

Plaintiff contends that summary judgment for TMM was improper because there was sufficient evidence that TMM terminated him in retaliation for not participating in the marijuana smoking and for reporting it.  According to plaintiff, TMM's actions violated public policy.  We disagree with plaintiff's contention that he provided evidence of retaliation sufficient to preclude summary judgment for defendants in this case.  Plaintiff's purported evidence of retaliatory discharge was based on unsupported assertions, opinions, and conclusory, self-serving statements that he made in his deposition testimony.   

First, plaintiff asserts that he had no significant performance problems before the Doral conference and was told of none.  However, some of his performance reports in the years before the conference reflected suggestions that plaintiff improve his sales performance.  When Rooney started with TMM in March 1994, he evaluated plaintiff as being "off track" by making ineffective sales presentations and improperly spending time on market research.  In addition, Curt Costin's March 1994 performance evaluation of plaintiff acknowledged that he was a valued salesperson over the years, but also stated that plaintiff needed to "increase call volume and activity in his territory."  Furthermore, Marquardt discussed plaintiff's performance with him twice before the Doral conference.  Specifically, Marquardt criticized plaintiff that he was not coming into the office regularly, had only made a few office calls, and dressed in casual attire.  Marquardt conveyed the severity of decreased sales in plaintiff's territory, and told him that his lack of sales calls and casual dress did not indicate a willingness to improve.  Accordingly, plaintiff's assertion that he had no "significant performance problems" and was never told of any is unsupported by the record.

Next, plaintiff contends that the timing of his termination, which was after the Doral conference and after Marquardt learned that plaintiff reported the marijuana incident, created the reasonable inference of retaliation.  According to plaintiff, Marquardt considered plaintiff's reporting of the incident the "last straw."  An accurate review of the record reveals that Marquardt's "last straw" comment referred to plaintiff's failure to attend a scheduled meeting in New York the night before a sales conference.  In fact, Marquardt stated that "[t]he pot smoking incident and everything else about that was none of my business and had absolutely nothing to do with my anger."  Moreover, the timing of the termination, by itself, is not enough to show retaliatory discharge.  See 
Marin v. American Meat Packing Co.
, 204 Ill. App. 3d 302, 308, 562 N.E.2d 282, 285 (1990) (where the plaintiff filed an action alleging retaliatory discharge for filing a worker's compensation claim, court stated that the causality element requires more than a discharge in connection with the filing of the claim).

Plaintiff also argues that there was direct evidence of TMM's animosity toward him over his refusal to participate in the marijuana smoking and his reporting of the incident.  Again, plaintiff's argument is based on his self-serving deposition testimony that Rooney stated at a staff meeting that someone had betrayed the group's trust by reporting the incident, while looking at plaintiff.  Plaintiff also based this argument on Marquardt's "last straw" comment, which we have previously discussed.  In addition, plaintiff asserts that Moskowitz's failure to investigate plaintiff's complaint of possible retaliation demonstrated Moskowitz's animosity toward him.  Moskowitz explained that while he did not totally dismiss the charges in the letter, he believed that plaintiff was trying to "set up" TMM and protect himself because he thought that he was about to be terminated.  Moskowitz knew that plaintiff had had performance problems.  Furthermore, Moskowitz testified that it was not his decision to terminate plaintiff.

Finally, plaintiff contends that TMM's explanation that plaintiff was terminated for unsatisfactory performance was "a carefully crafted attempt to cover up defendants' retaliatory motivations."  According to plaintiff, TMM failed to follow company policy by not providing him with written warnings and an opportunity to improve.  The evidence showed that such actions were optional.  In any case, the evidence showed that plaintiff had been notified of his need to improve his sales performance.  Plaintiff also concludes that TMM attempted to fabricate evidence supporting his termination after he was terminated.  There is no basis in the record for plaintiff's assertion.                

The evidence in this case showed that Marquardt was hired to improve declining sales in plaintiff's region, that his evaluation of plaintiff showed a need for improvement before the Doral conference, and that plaintiff never met Marquardt's expectations for improvement.  Furthermore, Marquardt made the decision to terminate plaintiff in August 1994.  At that time, there was no evidence that Marquardt smoked marijuana or that Marquardt knew in August 1994 that plaintiff had refused to smoke it.  Any contention that Marquardt retaliated against plaintiff for his refusal to smoke marijuana has no basis in the record.  Marquardt stated that he wanted to maintain continuity and coverage in the office before terminating plaintiff.  He hired Flaharty to join the Chicago office in October.  Meanwhile, plaintiff wrote the letter to Moskowitz, in which he reported the marijuana incident and stated that he feared that he was being "unjustly penalized" for not participating in the marijuana smoking.  The evidence further showed that Marquardt made the final decision to terminate plaintiff in October, after plaintiff failed to attend a scheduled meeting.  He characterized that action as the "last straw."  At the same time, Marquardt learned that plaintiff had reported the marijuana incident.  However, he stated in his deposition that the incident and everything else about it had nothing to do with his anger. 

Plaintiff's attempts to create genuine issues of material fact are based on assertions unsupported in the record and conclusory, self-serving deposition testimony.  Upon our 
de
 
novo
 review of the record, we find that summary judgment in TMM's favor on the retaliatory discharge claim was proper.  

Plaintiff also contends that summary judgment for defendants on the claims for breach of contract and tortious interference with a contract was in error.  "Generally, an employment relationship of indefinite duration is terminable 'at will' by either party with or without cause."  
Habighurst v. Edlong Corp.
, 209 Ill. App. 3d 426, 428, 568 N.E.2d 226, 227 (1991).  The presumption of at-will employment status may be overcome by an employee handbook only if the traditional requirements of contract formation exist.  
Duldulao v. St. Mary of Nazareth Hospital Center
, 115 Ill. 2d 482, 505 N.E.2d 314 (1987).  As a question of law, the trial court determines the existence of a contract.  
Habighurst
, 209 Ill. App. 3d at 431, 568 N.E.2d at 229.  To establish the existence of an employment contract using an employee handbook:

"First, the language of the policy statement must contain a promise clear enough that an employee would reasonably believe that an offer has been made.  Second, the statement must be disseminated to the employee in such a manner that the employee is aware of its contents and reasonably believes it to be an offer.  Third, the employee must accept the offer by commencing or continuing to work after learning of the policy statement.  When these conditions are present, the employee's continued work constitutes consideration for the promises contained in the statement, and under traditional principles a valid contract is formed."  
Duldulao
, 115 Ill. 2d at 490, 505 N.E.2d at 318.

Nevertheless, disclaiming language in an employee handbook precludes the formation of an employment contract.  
Habighurst
, 209 Ill. App. 3d at 429, 568 N.E.2d at 228. 

To maintain an action for tortious interference with a contract, a plaintiff must plead and prove: "(1) the existence of a valid and enforceable contract between plaintiff and another; (2) defendant's awareness of the contractual relationship; (3) defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by defendant's wrongful conduct; and (5) damages."  
Schott v. Glover
, 109 Ill. App. 3d 230, 234, 440 N.E.2d 376, 378 (1982).    

We affirm the trial court's granting of summary judgment for defendants on those counts because such causes of action require the existence of a valid and enforceable contract, which did not exist in this case.  The disclaimer language in the employee handbook, in which TMM reserved the right to amend, modify or delete any provisions of the handbook and in which TMM stated that any employment was at will, precluded the formation of a contract.  

Plaintiff's final argument is that summary judgment for defendants on the two civil conspiracy claims was improper.  Plaintiff had alleged that TMM conspired with the individual defendants to terminate him in retaliation for his activities and that the individual defendants conspired with each other to tortiously interfere with his alleged employment contract.  Summary judgment on the civil conspiracy claims was proper because, as we have discussed, plaintiff failed to present sufficient evidence of retaliatory discharge and the existence of an employment contract.  Because plaintiff failed to prove the existence of the underlying tort and contract actions, he cannot prove the existence of conspiracies for those actions.  See 
Galinski v. Kessler
, 134 Ill. App. 3d 602, 609, 480 N.E.2d 1176, 1181 (1985).  Moreover, because the individual defendants were TMM's agents, there could have been no conspiracy among the individual defendants and TMM regarding a retaliatory discharge in violation of public policy.  See 
Buckner v. Atlantic Plant Maintenance, Inc.
, No 83321, slip op. at 2, 6 (Ill. April 16, 1998) (former employer is the only proper defendant in a retaliatory discharge action, and former co-employee, as agent of former employer, cannot conspire to effect a retaliatory discharge in violation of public policy).

In sum, we find upon 
de
 
novo
 review that summary judgment for defendants was proper on the retaliatory discharge, breach of contract, tortious interference with contract, and civil conspiracy claims.  Plaintiff's purported evidence of retaliatory discharge was based on unsupported assertions, opinions, and conclusory, self-serving statements that he made in his deposition testimony.  Furthermore, plaintiff failed to present sufficient evidence to show the existence of an employment contract.  Therefore, there was no contract to breach or with which to interfere.  Finally, because plaintiff failed to provide sufficient evidence of the underlying tort and contract actions, he could not prove the existence of conspiracies for those actions.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

MCNULTY, P.J., and RAKOWSKI, J., concur.