FOURTH DIVISION

November 27, 2002 

No. 1-00-2507

ROBERT C. KANE and PATRICIA KANE, 

Plaintiffs-Appellants,

v.

MOTOROLA, INC., THOMAS HULL, QUIRINO BALZANO, and JAMES PHILLIPS,   

Defendants-Appellees.

)

)

)

)

)

)

)

)

)

Appeal from the

Circuit Court of

Cook County

Honorable

Paddy H. McNamara,

Judge Presiding.

MODIFIED OPINION UPON DENIAL OF REHEARING
 

JUSTICE KARNEZIS delivered the opinion of the court:

Plaintiffs, Robert and Patricia Kane, brought this cause of action against defendants, Motorola and several of its employees, claiming that Robert Kane developed a brain tumor as a result of testing a prototype antenna for a cellular telephone when he was employed by Motorola as an engineer.  After a lengthy discovery process, the circuit court struck plaintiffs' two expert witnesses, Dr. Milham and Dr. Leestma, finding that their testimony was not based on scientific evidence.  The court subsequently granted defendants' motion for summary judgment on the basis that plaintiffs did not have any competent evidence on the issue of causation.  Plaintiffs now appeal.  On appeal, plaintiffs contend: (1) the court misapplied the 
Frye
 standard when it struck the testimony of plaintiffs' two expert witnesses; (2) the court erred in entering summary judgment; and (3) the court improperly limited the scope of discovery.  We affirm.

On three separate dates in 1984, plaintiff Robert Kane (Kane) conducted field tests for a prototype cellular telephone antenna.  The purpose of the tests was to assess the effectiveness of the antenna.  The first day of testing occurred on September 19, and the second and third days of testing occurred on November 4, and November 9.  Kane estimated the duration of the tests over the three-day period totaled about 60 to 90 minutes.  During many of the tests, Kane was directed to place the antenna approximately one centimeter above his right ear.  Kane noticed during the tests the telephone became hot against his head.  Several days after the last day of testing, Kane developed a skin condition on his right scalp that he characterized as "dermatitis."  He described his scalp as becoming very itchy and having a "wet feeling" that lasted several months.  Although plaintiffs' experts stated in their depositions that the "wetness" on Kane's scalp was also accompanied by excessive ear wax or a watery discharge from Kane's ear, Kane never mentioned such a symptom during his deposition. 

Kane estimated the prototype antenna operated at a power output of about 0.6 to 1 watt.  He acknowledged, however, Motorola documents indicated the antenna operated at 0.1 watt.  Kane also estimated the antenna operated at a frequency of about 845 megahertz.   

In 1992, Kane suffered a brain seizure and was diagnosed with a brain tumor.  The tumor was classified as a grade two oligodendroglioma malignancy.  It was located in Kane's right temporal lobe, the same area in which he held the prototype antenna and developed the wetness on his scalp.  Because the tumor mass was diffused as opposed to well-defined, it could not be completely removed.  Plaintiffs alleged in their complaint that during Kane's testing of the prototype antenna, he was exposed to an unsafe level of radio frequency (RF), which was the proximate cause of his brain tumor.  Plaintiff's complaint was filed in December 1993, approximately nine years after Kane had conducted the testing.  During discovery, plaintiffs requested the prototype antenna from defendants and defendants produced as much of the prototype as still existed, which included the inner circuitry.  Plaintiffs acknowledged receiving the prototype and further acknowledged returning the prototype to defendants after a period of time.  

Plaintiffs offered the expert witness testimony of two doctors, Dr. Samuel Milham and Dr. Jan Leestma, to establish that RF emitted from the prototype antenna caused Kane's tumor.  In his deposition, Dr. Milham, an epidemiologist, concluded the excessive discharge from Kane's ear and the wetness on Kane's scalp were evidence of an RF burn from the cellular antenna, which in turn led to the development of Kane's tumor.  Dr. Milham admitted, though, there was no scientific evidence that Kane's brain tissue suffered a burn injury.  He inferred that the wetness on Kane's scalp and the discharge from Kane's ear indicated a burn injury because a burn injury generally causes clear liquid to ooze.  Yet, he did not know whether a watery discharge associated with a regular burn would occur from an RF burn.  Dr. Milham admitted he did not know of any literature establishing a connection between a watery discharge and RF exposure.  He was also unaware of any scientific evidence demonstrating an association between wetness of the scalp and a brain tumor.  Dr. Milham also agreed that the wetness on Kane's scalp could have been described as dermatitis, which has numerous causes including allergies or diet.   He admitted it was possible to get dermatitis anywhere on the body, including on one 's scalp. 

Although Dr. Milham stated he believed there was evidence that tissue injury, including burn injury, was associated with the development of cancer, he was not aware of any evidence linking an RF burn with cancer.  He admitted the relevant scientific literature did not support the conclusion that RF exposure caused cancer.  Instead, he compared cancer developing on the skin after a sunburn with an RF burn causing a cancerous brain tumor.

Dr. Milham concluded the prototype antenna more probably than not caused Kane's brain tumor, but admitted he did not conduct a study or test to determine whether an antenna similar to the prototype antenna operating at 1 watt and at 845 megahertz would be able to cause a burn injury to brain tissue.  He further admitted he did not have the expertise to determine whether the prototype antenna had enough power to injure or burn Kane's brain tissue.  Dr. Milham admitted he could not state to a reasonable degree of medical certainty that RF exposure initiated Kane's brain tumor.  Dr. Milham further admitted he was not aware of any scientific evidence showing an oligodendroglioma developing in as little as eight years and had no knowledge of latency periods for that type of tumor. 

Dr. Leestma, a neuropathologist, stated in his deposition that he believed RF exposure "might or could" cause cancer in humans, but could not state to a reasonable degree of medical certainty that exposure to RF caused human brain cancer.  Although he believed Kane's dermatitis-like condition was caused by RF exposure, he did not consult a dermatologist or conduct research to determine whether dermatitis could develop on one's scalp without exposure to RF.  He was also not aware of any scientific evidence that RF exposure caused dermatitis or of any evidence demonstrating an association between dermatitis and brain tumors. 

Dr. Leestma stated that Kane's excessive ear wax supported his opinion that the RF radiation Kane was exposed to might or could have caused Kane's brain tumor because it was a symptom reported in the same location as Kane's exposure to RF.  He stated, though, he could not cite to any scientific evidence to establish that an increase in temperature associated with RF exposure was sufficient to stimulate the glands that produce ear wax.  He also was not aware of any scientific evidence that found that increased production of ear wax was a symptom of a brain tumor.

Dr. Leestma admitted there was no objective evidence that Kane sustained a burn injury based on his examination of the tissue samples of Kane's tumor.  He stated he believed exposure to RF might or could have induced changes in Kane's DNA that could have resulted in Kane's tumor.  However, he did not know of any scientific evidence indicating that exposure to 845 megahertz of RF has sufficient energy to break a chemical bond in the human body.  Dr. Leestma also admitted he did not know of any scientific data indicating RF was capable of breaking DNA bonds in human tissue.  He further admitted that breaks in DNA bonds do not necessarily mean cancer will occur. 

Dr. Leestma also admitted that although he did not know whether there was a latency period for oligodendroglioma tumors, he believed that eight years came within the domain of credibility.  He also stated that the most common site for oligodendroglioma tumors is in the temporal lobe, the same location where Kane's tumor was located.  

Dr. Leestma further stated that although there were reports in the media about individuals developing brain tumors from cellular telephones, there were no scientific case studies in peer-reviewed literature establishing a connection between brain tumors and RF radiation.  He admitted he did not perform laboratory research to confirm whether RF caused any type of cancer and was not aware of any laboratory studies in which RF induced brain cancer in a laboratory animal. 

Defendants filed a motion to strike plaintiffs' experts as well as a motion for summary judgment.  The circuit court struck the motions without prejudice on the basis that the motion for summary judgment was too broad.  The court directed defendants to file amended motions narrowing the scope of the motion for summary judgment.  The court then informed plaintiffs that if they had insufficient knowledge to respond to the amended motions they could file an affidavit pursuant to Supreme Court Rule 191(b) (145 Ill. 2d R. 191(b)), in which they could request additional discovery to respond to the allegations. 

Defendants' amended motion to strike plaintiffs' experts alleged their testimony failed to meet the 
standard of reliability as set forth in 
Frye v. United States
, 293 F. 1013 (D.C. Cir. 1923).  Defendants' amended motion for summary judgment was limited to the issue of causation and alleged plaintiffs were unable to bring forth competent testimony as to causation.  Defendants attached the affidavits of Dr. Christopher Davis and Dr. Theodore L. Phillips. 

Dr. Davis, who received his Ph.D. in physics, averred that Kane's exposure to RF could only have elevated Kane's brain temperature a maximum of about .23 degrees Celsius.  He further averred that an elevation in temperature in the brain even by a few degrees can happen naturally without harmful effects, such as when a person exercises.  

Dr. Theodore L. Phillips, a medical doctor, averred that it would be scientifically impossible for the RF radiation to which Kane was exposed to have burned Kane's brain tissue.  He stated there was no scientific evidence that a short-term elevation in temperature was associated with the development of cancer or with the mutation of human cells.  He concluded the peer-reviewed scientific research did not support a causal relationship between RF and the development of cancer in the brain or in any other human tissue.  

Several months later and prior to the court's ruling on defendants' motions, plaintiffs were permitted to disclose a third expert witness, Dr. Jerry Phillips.  Dr. Jerry Phillips and defendants' expert, Dr. Theodore Phillips, are not related.  Dr. Jerry Phillips, who received his Ph.D. in biochemistry, stated in his affidavit he believed "more likely than not" that Kane's tumor was the result of exposure to RF during the testing of the prototype antenna.  He stated he relied on scientific studies that indicated RF can alter biological processes and lead to adverse biological effects.  He stated his opinion was also based on animal laboratory studies in which animals developed cancers at an accelerated rate when exposed to RF. 

Plaintiffs then responded to defendants' motions, attaching an affidavit from Bill Curry, who they introduced as a rebuttal witness for the purpose of refuting defense expert Dr. Christoper Davis.  Curry, a physicist, averred that Dr. Davis's conclusions were "flawed" and "unreliable."  Plaintiffs did not file a Rule 191(b) affidavit alleging additional discovery was necessary.  

The circuit court granted defendants' motion to strike Drs. Milham and Leestma, noting that both experts' testimony was based upon speculation rather than scientific evidence.  The court found that Dr. Milham admitted none of the epidemiological studies upon which he relied indicated the RF exposure experienced by Kane caused brain tumors.  The court further found that, similarly, Dr. Leestma was unable to cite to any scientific evidence linking RF to brain tumors.  The court did not comment on plaintiffs' third expert, Dr. Jerry Phillips, or affiant Bill Curry.   

The circuit court subsequently granted defendants' motion for summary judgment finding that plaintiffs were unable to present competent testimony showing causation.  The court noted the insufficiency of both Dr. Milham's and Dr. Leestma's testimony, but again did not mention Dr. Jerry Phillips or Bill Curry.

On appeal, plaintiffs first contend the circuit court erred in striking the testimony of its two experts, Drs. Milham and Leestma.  They contend their experts' testimony was sufficient to satisfy the 
Frye
 standard of reliability because their conclusions were extrapolated from generally accepted scientific data.  Plaintiffs maintain that an expert's testimony is admissible even when the conclusion is not generally accepted in the scientific community as long as the expert's conclusions were extrapolated from sound scientific data. 

In Illinois, "the exclusive test for the admission of expert testimony is governed by the standard first expressed in 
Frye v. United States
, 293 F. 1013 (D.C. Cir. 1923)."  
Donaldson v. Central Illinois Public Service Co.
, 199 Ill. 2d 63, 76-77, 767 N.E.2d 314 (2002).  This standard, also referred to as the "general acceptance" test, indicates that scientific evidence is admissible "if the methodology or scientific principle upon which the opinion is based is 'sufficiently established to have gained general acceptance in the particular field in which it belongs.'"  
Donaldson
, 199 Ill. 2d at 77, quoting 
Frye
, 293 F. at 1014. 
 General acceptance applies to the underlying methodology used to generate the conclusion; it does not concern the actual conclusion reached.  
Donaldson
, 199 Ill. 2d at 77.  Despite the novelty of the conclusion reached by the expert, the fact finder may consider the opinion if the underlying methodology used to generate the opinion is reasonably relied on by experts in the field.  
Donaldson
, 199 Ill. 2d at 77.  A cause-effect relationship need not be clearly established before an expert can testify that such a relationship exists, as long as the basic methodology employed to reach the conclusion is sound.  
Donaldson
, 199 Ill. 2d at 78, quoting 
Ferebee v. Chevron Chemical Co.
, 736 F.2d 1529, 1535-36 (D.C. Cir. 1984).  A technique or methodology, however, "is not 'generally accepted' if it is experimental or of dubious validity."  
Donaldson
, 199 Ill. 2d at 78.

Extrapolation is commonly used by scientists when the medical inquiry is new or the opportunities to examine a specific cause and effect relationship are limited.  
Donaldson
, 199 Ill. 2d at 84-85; see also 
Linstrom v. Han
, No. 1-00-4028, slip op. at 9 (August 29, 2002)(extrapolation is a generally accepted technique in cases that involve a question to which medical science lacks a clear answer).  In these limited instances, an expert may rely upon scientific literature discussing similar, yet not identical, cause and effect relationships.  
Donaldson
, 199 Ill. 2d at 85.  "'As long as the basic methodology employed to reach such a conclusion is sound, such as use of tissue samples, standard tests, and patient examinations, products liability law does not preclude recovery until a "statistically significant" number of people have been injured or until science has had the time and resources to complete sophisticated laboratory studies * * *.'"  
Donaldson
, 199 Ill. 2d at 86, quoting 
Ferebee
, 736 F.2d at 1535-36. 

In 
Donaldson
, the plaintiffs' experts utilized extrapolation to conclude that a cause and effect relationship existed between the exposure to coal tar and the development of neuroblastoma, a rare form of cancer.  The plaintiffs' experts had testified that extrapolation was necessary because the relationship between coal tar and neuroblastomas had not been the subject of extensive study and research.  

 The court found the plaintiffs' experts' testimony had been properly admitted because the experts' conclusions were based on similar, although not identical, scientific studies and theories.  
Donaldson
, 199 Ill. 2d at 88.  The court noted the plaintiffs' experts had testified that they utilized the method of extrapolation and that the technique was generally accepted in their fields.  
Donaldson
, 199 Ill. 2d at 87-88.  The court also reiterated that the relevant inquiry was whether the methodologies used to extrapolate the conclusion were generally accepted among the scientific community, not whether the actual conclusion reached was generally accepted.  
Donaldson
, 199 Ill. 2d at 88.

Nevertheless, courts may reject an expert's conclusions when their extrapolation methodologies are unsound or when the scientific data upon which they rely is not related to the conclusion reached.  In 
General Electric Co. v. Joiner
, 522 U.S. 136, 139 L. Ed. 2d 508, 118 S. Ct. 512 (1997), the Supreme Court found the plaintiffs' experts' testimony inadmissible because the animal studies upon which they based their conclusions were so dissimilar to the facts presented in the litigation.  The court noted that the experts failed to explain why and how they extrapolated their opinions from the seemingly far-removed animal studies.  The court further noted "there [was] simply too great an analytical gap between the data and the opinion proffered."  
Joiner
, 522 U.S. at 146, 139 L.Ed.2d at 519, 118 S.Ct. at 519.     

Additionally, in 
Schmaltz v. Norfolk & Western Ry. Co.
, 878 F. Supp. 1119 (N.D. Ill. 1995), the plaintiff claimed his exposure to certain herbicides containing atrazine caused his chronic respiratory disease.  The court found the experts' testimony inadmissible because the experts could not cite to any documented cases where exposure to the alleged chemical caused the alleged illness.  Rather, the experts relied on studies where high doses of atrazine caused eye irritation in rabbits.  The court noted the "analytical gap between the evidence presented and the inferences to be drawn * * * is too wide."  
Schmaltz
, 878 F. Supp. at 1122.    

Although plaintiffs suggest a 
de novo
 standard of review, our supreme court has made it clear that 
Frye
 issues are reviewed under an abuse of discretion standard.  
Donaldson
, 199 Ill. 2d at 76.  

Here, it was not an abuse of discretion for the circuit court to conclude that plaintiffs' experts' testimony was inadmissible because their conclusions were based on speculation rather than sound science.  Although plaintiffs argue their experts' conclusions were based on numerous scientific data, both experts acknowledged in their depositions the scientific data did not support their conclusions that Kane suffered an RF burn, which led to his development of a brain tumor.  The experts stated they knew of no studies indicating an RF burn was capable of causing a brain tumor.  They also could not rule out any other cause of Kane's tumor, including genetics.  Plaintiffs' experts were unable to state how they extrapolated their conclusions from the scientific data upon which they relied or how the numerous dissimilar studies they cited to supported their conclusions.  They also acknowledged they had not conducted any independent tests or investigation to determine whether the prototype or an antenna similar to the prototype was capable of causing an RF burn.  Plaintiffs' experts were unable to explain what steps they took or methodologies they used to extrapolate their opinions.  A court is not required to accept any conclusion an expert may reach merely because the expert claimed the conclusion was extrapolated from generally accepted scientific data.  An expert must be able to show the methodologies he employed to extrapolate his conclusion were sound.  Plaintiffs' experts failed to do so.    

Although plaintiffs repeatedly argue the eight-year latency period in which Kane's tumor developed supports their claim, they fail to acknowledge that both experts stated they were not aware of a known latency period for oligodendroglioma tumors. 

Plaintiffs also argue the circuit court mistakenly rejected Dr. Leestma's testimony because he concluded Kane's exposure to RF "might or could have" caused the brain tumor.  They argue that a "might or could have" opinion by an expert is sufficient for admissibility on causation.  

We reject plaintiffs' claim because it is not supported by the record.  The court stated it excluded Dr. Leestma's opinion because he admitted there was no scientific data to support his opinion.  

Plaintiffs next contend the circuit court erred in granting summary judgment.  Plaintiffs argue the court ignored plaintiffs' expert Dr. Jerry Phillips and affiant Bill Curry, whose testimony was sufficient to preclude summary judgment.  

Summary judgment is proper if the pleadings, depositions, affidavits, admissions, and other matters on file demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.  
Smith v. Armor Plus Co.
, 248 Ill. App. 3d 831, 839, 617 N.E.2d 1346 (1993).  A triable issue of fact exists where there is a dispute as to material facts or where the material facts are undisputed but reasonable persons might draw different inferences from those facts.  
In re Estate of Hoover
, 155 Ill. 2d 402, 411, 615 N.E.2d 736 (1993).  The court should construe the evidence strictly against the movant and liberally in favor of the opponent.  
Richter v. Burton Investment Properties, Inc.
, 240 Ill. App. 3d 998, 1001, 608 N.E.2d 1254 (1993).  Appellate review of an order granting summary judgment is 
de novo
.  
Outboard Marine Corp. v. Liberty Mutual Insurance Co.
, 154 Ill. 2d 90, 102, 607 N.E.2d 1204 (1992).   

Although a party opposing a motion for summary judgment need not prove his case, he must provide some factual basis that would arguably entitle him to judgment under the law.  
Davis v. Times Mirror Magazines, Inc.
, 297 Ill. App. 3d 488, 495, 697 N.E.2d 380 (1998).  In 
Davis
, this court found that the plaintiff's claims of retaliatory discharge were insufficient to raise a question of fact to preclude summary judgment for the defendant.  The plaintiff's purported evidence of retaliatory discharge was based on unsupported assertions, opinions, and conclusory, self-serving statements that he made in his deposition testimony, and which were not supported by the record.  The court found that because the plaintiff's attempts to create genuine issues of material fact were based on assertions unsupported by the record, summary judgment for the defendant was proper.  
Davis
, 297 Ill. App. 3d at 497-498.   

Here, we find the circuit court's order entering summary judgment in favor of defendants proper.  Plaintiffs' complaint alleged that Kane's exposure to the prototype antenna was the proximate cause of his brain tumor; however, plaintiffs failed to bring forth any competent evidence in support of proximate cause.  Although plaintiffs argue the circuit court failed to consider the testimony of Dr. Jerry Phillips and Bill Curry, plaintiffs fail to specifically argue how their testimony created a question of fact with regard to causation.  Plaintiffs refer only to the conclusory, unsupported allegations in each of their affidavits.  Plaintiffs neither cite to nor argue that their deposition testimony created a question of fact.  It is not a reviewing court's duty to search the record for "unargued" and "unbriefed" reasons to reverse a lower court's decision.  
Boeger v. Boeger
, 147 Ill. App. 3d 629, 631, 498 N.E.2d 814 (1986).  Although plaintiffs need not prove their case at the summary judgment stage, they must come forward with scientific evidence regarding causation to preclude the entry of summary judgment.  Summary judgment is proper when the party opposing the motion cannot establish an essential element of his or her cause of action.  
Volpe v. IKO Industries, Ltd.
, 327 Ill. App. 3d 567, 577-78, 763 N.E.2d 870 (2002).  Because plaintiffs were unable to establish causation, summary judgment was proper.

Lastly, plaintiffs argue the circuit court abused its discretion when it limited the scope of discovery.  Plaintiffs maintain that although they did not file a Rule 191(b) affidavit in response to defendants' motion for summary judgment, their discovery requests already before the court were sufficient to comply with the rule. 

When a party cannot sufficiently respond to a motion for summary judgment because it believes additional discovery is necessary, it may file a Rule 191(b) affidavit.  
Giannoble v. P&M Heating & Air Conditioning, Inc.
, 233 Ill. App. 3d 1051, 1064, 599 N.E.2d 1183 (1992); see also 145 Ill. 2d R. 191(b).  Rule 191(b) provides:

"If the affidavit of either party contains a statement that any of the material facts which ought to appear in the affidavit are known only to persons whose affidavits affiant is unable to procure by reason of hostility or otherwise, naming the persons and showing why their affidavits cannot be procured and what affiant believes they would testify to if sworn, with his reasons for his belief, the court may make any order that may be just, either granting or refusing the motion, or granting a continuance to permit affidavits to be obtained, or for submitting interrogatories to or taking the depositions of any of the persons so named, or for producing papers or documents in the possession of those persons or furnishing sworn copies thereof."  145 Ill. 2d R. 191(b).

The "[f]ailure to comply with Rule 191(b) defeats an objection on appeal that insufficient time for discovery was allowed." 
 
Giannoble
, 233 Ill. App. 3d at 1064.   

Here, despite the circuit court's advisement that plaintiffs would be permitted to file a Rule 191(b) affidavit if they needed additional discovery, plaintiffs failed to do so.  They cannot now complain the discovery process was insufficient or limited.  Although they argue their discovery requests were sufficient in form to satisfy the technical requirements of Rule 191(b), the cases they rely on do not support their argument.  These cases concern situations where a party filed an affidavit requesting additional discovery, but the affidavit was in some way technically deficient.  We reject plaintiffs' contention.  
 

Accordingly, the judgment of the circuit court is affirmed.  

Affirmed.

THEIS, P.J., and GREIMAN, J., concur.