PERFECTION CORPORATION, Plaintiff-Appellee, v. LOCHINVAR CORPO-
RATION *et al.*, Defendant-Appellants.

First District (5th Division)   No. 1—03—0095

Opinion filed June 18, 2004.

Mayer, Brown, Rowe & May, of Chicago (Alan J. Martin, Robert M. Dow, Jr., and Jonathan L. Lewis, of counsel), for appellants.

Mandell, Menkes & Surdyk, L.L.C., of Chicago (Steven L. Baron, of counsel), and Swidler, Berlin, Shereff & Friedman, L.L.P., of Washington, D.C. (John R. Ferguson, Ky E. Kirby, and Michael A. Valerio, of counsel), for appellee.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Defendants-counterclaimants A.O. Smith Corporation, American Water Heater Company, Bradford White Corporation, Lochinvar

Corporation, and Rheem Manufacturing Company (collectively Tank Manufacturers) appeal from entry of summary judgment in favor of plaintiff, Perfection Corporation (Perfection), on their claim alleging lost profits as a result of damage to their business reputations in connection with the purchase of an allegedly defective water heater component. On appeal, the Tank Manufacturers contend that: (1) the trial court misapprehended the controlling law in ruling that expert testimony was inadmissible; and (2) genuine issues of fact remain in dispute regarding alleged damage to business reputation claims. For the following reasons, we affirm the judgment of the trial court.

BACKGROUND

Defendants, Tank Manufacturers, manufacture water heaters. Plaintiff Perfection manufactures and sells a component part for water heaters called a "dip tube." The dip tubes assist the water heater in the process of heating the water by delivering the inflow of water to a greater depth within the water heater than would otherwise be achieved without the dip tube. To accomplish this function, the dip tube must be constructed of material that can function and not deteriorate in the environment of a water heater. Prior to 1993, Perfection and one or more of the Tank Manufacturers entered into agreements to purchase dip tubes for use with the water heaters they manufactured.

Perfection had been manufacturing and selling plastic dip tubes for approximately 40 years. From approximately 1975 through 1992, and from October 1996, to the time of this action, Perfection manufactured dip tubes out of a proprietary form of polypropylene called Himont, a form of plastic, that Perfection purchased in precompound pellets. During some of this time period, Perfection was the sole supplier of dip tubes to at least some of the Tank Manufacturers. Polypropylene dip tubes made out of Himont were time-proven tubes and virtually all lasted for the life of the water heater. Perfection received only 10 to 12 returns of Himont dip tubes a year out of approximately 5 million manufactured annually.

In 1992, Perfection entered into negotiations with Manner Plastics Materials, Inc., for the purchase of a proprietary form of polypropylene called Prolene 6654 (Prolene). Between August 1993 and October 1996, Perfection manufactured its dip tubes out of Prolene. The Tank Manufacturers installed the Prolene dip tubes in their water heaters. During the period that Prolene dip tubes were used, the Tank Manufacturers received reports from field personnel that a certain percentage of Prolene tubes were deteriorating inside water heaters during the first year and a half of use, resulting in loss of function of

the water heaters, clogging of plumbing lines, loss of water pressure, and damage to appliances.

On July 16, 1999, more than 20 consumer class action litigations were initiated against the Tank Manufacturers and Perfection asserting that Prolene tubes deteriorated prematurely inside water heaters. The Tank Manufacturers ultimately entered into a nationwide settlement with a consumer class certified by a federal court. Perfection was not party to the settlement, nor did the settlement agreement purport to release Perfection from any potential liability to the consumer class. Rather, the settlement agreement purported to assign to the Tank Manufacturers any claims that the settlement class members might have against Perfection. The Tank Manufacturers' counterclaims are premised both on their own alleged direct causes of action against Perfection as well as in their capacities as assignees of consumer claims against Perfection.

On March 23, 2001, the Tank Manufacturers filed counterclaims alleging strict liability/negligence, breach of contract, breach of express and implied warranties, misrepresentation, negligence, and unjust enrichment. On May 31, 2002, the Tank Manufacturers filed consolidated counterclaims alleging all of the above, and adding allegations in counts III (misrepresentation) and IV (negligence) for damages to their business reputations in the aggregate of $182 million. The Tank Manufacturers alleged that as a result of the property damage claims filed by consumer claimants, the Tank Manufacturers and their water heaters were:

> "disparaged, criticized, questioned, and maligned in television, print, and other media directed at the public, including but not limited to, reports on the national *Good Morning America* television show, in Chicago on WMAQ TV-News Channel 5, on the *Appliance Doctor* syndicated radio show, and in the *Wall Street Journal.*"

The Tank Manufacturers alleged that the negative publicity surrounding the property damage claims "has damaged and will continue to damage the Tank Manufacturers' goodwill and present and future profitability."

In support, the Tank Manufacturers submitted expert opinion evidence given by Dr. Silas H. Lee III and Dr. Darrell L. Williams. Dr. Lee, an expert specializing in public opinion and marketing research, conducted a generic consumer survey or poll, examining how consumers feel about purchasing a product that was defective and what impact purchasing a defective product would have on the reputation of a company. Based on his survey results, Dr. Lee opined that "consumers are less likely to buy a product if it is manufactured by a company that produced something defective in the past" and concluded that

purchasing a defective product has a negative impact on reputation. Dr. Lee did not do a study specifically relating to water heaters.

Dr. Williams, a professor and economist, employed a technique called the "event study methodology" to analyze whether Tank Manufacturer A.O. Smith, a publicly traded company, suffered damage to its reputation as a result of public comments relating to the dip tube litigation and, if so, to quantify the magnitude of any such damages. Dr. Williams described the event study methodology as a "commonly and widely accepted method used by economists to estimate the change in the market value of a company as reflected in the change in the market value of the company's equity." Dr. Williams explained that the event study methodology is "based on the widely accepted principle that publicly available information relevant to the valuation of a company is rapidly incorporated into stock prices such that the market value of a company's equity responds quickly to information that is relevant to the company's market value."

An "event" is an informational disclosure, such as an appearance in a newspaper, television or radio. Dr. Williams established an "event window," *i.e.*, the period of time over which that disclosure is deemed to have an "effect." Dr. Williams described the methodology as using "statistical techniques in order to isolate stock price effects resulting from relevant information disclosures, in this case those related to defective dip tubes, as opposed to general market-wide stock price movements or random variance in stock prices." In other words, Dr. Williams calculated the "loss" based on the "event." Dr. Williams explained that a premise of the event study methodology is that the market value of a firm, the sum of the value of all of its assets, broadly defined, is equal to the market value of its equity plus the market value of its debt.

Dr. Williams analyzed the measure of changes in the price of A.O. Smith's publicly traded stock during three separate three-day periods and determined that a decline in the stock price was solely the result of two newspaper reports in the Kansas City Star and a local Detroit radio broadcast about the dip tube claims and class action litigation against the Tank Manufacturers (the "events"). For each event, Dr. Williams calculated the total change in the closing stock price of A.O. Smith for the three-day period from what he deemed public dissemination of these local media reports. He then translated the net change in stock price of A.O. Smith into a change in the aggregate "market value" of the company's stock by multiplying the per-share price change by the number of shares outstanding.

In rendering his opinion, Dr. Williams produced his calculations of the change in A.O. Smith's stock value for the three separate three-

day periods selected between March 1999 and April 2000. Dr. Williams totaled these amounts and concluded that, on these nine days, A.O. Smith's stock value had decreased by over $115 million. Deducting all nonreputational damage claims that A.O. Smith asserted in the counterclaim, *i.e.*, its alleged direct costs, Dr. Williams reduced his aggregate stock value decrease to $80 million and identified this result as A.O. Smith's "reputational" or "brand" damage. None of the other Tank Manufacturers are publicly traded and there is no published source of their stock prices. Dr. Williams therefore extrapolated the A.O. Smith stock price study to the other four corporate counterclaimant Tank Manufacturers and assumed a "reputational" impact proportionately equal to that calculated for A.O. Smith stock. Totaling the figures for each corporation under five alternate methods of comparison, Dr. Williams estimated that the "average" aggregate business reputation damage allegedly incurred by the Tank Manufacturers was $195 million.[1]

Perfection filed a motion for summary judgment and a motion to strike the Tank Manufacturers' counterclaims for damages to their business reputation. Perfection argued that the Tank Manufacturers deliberately waited until the closing days of discovery to file this claim, in order to gain an advantage in discovery. On November 15, 2002, a full hearing on Perfection's motions was held before Judge Lester D. Foreman. The trial court noted that "when the value of a share of stock in a corporation goes down on the market, that doesn't necessarily mean that the value of the corporation has gone down," that changes in the value of stock changes what an individual will pay for a share of stock on a given day, but "doesn't change the intrinsic value of the company." The court questioned how the expert knew "that the stock dropped down because of the events" in the present case:

> "He's going to say that there was an article in the paper and it talked about the fact that people are very unhappy because these tanks are not operating efficiently and the reason for it and that customers are highly dissatisfied, and then he's going to say on that exact date the stock drops."

The trial court concluded that Dr. Williams' analysis was speculative and did not indicate damage to the company, but rather, damage to the stockholder: "I don't think that you can just pinpoint because this man sees an adverse event and the stock does down, he says that is

---

[1]Perfection notes in its brief that the Tank Manufacturers had previously identified $182 million in damages as the aggregate from their business reputation damages claims. Dr. Williams calculated aggregate figures ranging from $150 million to $230 million and then averaged these figures, yielding a sum of $195 million.

unquestionably an adverse effect upon the company's reputation, I just can't see it." The trial court granted Perfection's motion for summary judgment. On November 22, 2002, the trial court vacated its order entered on November 15, 2002, and entered an order granting Perfection's motion for summary judgment and deeming Perfection's motion to strike moot. The trial court noted that pursuant to Supreme Court Rule 304(a), there is no just reason for delay of enforcement or appeal of the summary judgment ruling. 155 Ill. 2d R. 304(a). This timely appeal followed.

OPINION

Initially, the Tank Manufacturers contend that the trial court erred in granting summary judgment in favor of Perfection and in ruling that Dr. Williams' expert opinion was inadmissible under *Frye v. United States*, 293 F. 1013 (D.C. 1923). The Tank Manufacturers argue that under *Frye*, expert opinion is admissible if it is based upon a generally accepted methodology or technique (*Donaldson v. Central Illinois Public Service Co.*, 199 Ill. 2d 63, 76-77, 767 N.E.2d 314 (2002)) and that Williams' "event study" is an accepted method of determining loss of profits as a result of damages to reputation.

The Tank Manufacturers argue that *Donaldson* supports their position that the event study methodology is generally accepted. In *Donaldson*, the plaintiffs, four sets of parents of children, brought an action against the defendant, the owner of a former manufactured gas plant, alleging that ceratin acts or omissions by the defendant and its contractors during the cleanup of the site certain chemicals and dusts emitted from the ground, causing their children to develop neuroblastoma, a rare form of cancer. The trial court allowed expert opinion testimony about a new medical epidemiological inquiry to establish a cause and effect relationship between coal tar and neuroblastoma; all of the experts utilized the method of "extrapolation," a generally accepted method used in the fields of medical and scientific research. *Donaldson*, 199 Ill. 2d at 87. The defendant argued that the *conclusion* of the experts, that coal tar caused the cancer, was not generally accepted in the scientific community. This court disagreed with the defendant, and the supreme court affirmed, holding that "the *Frye* standard does not demand unanimity, consensus, or even a majority to satisfy the general acceptance test." *Donaldson*, 199 Ill. 2d at 88.

Perfection responds that the Tank Manufacturers misconstrue the ruling of the trial court. Perfection argues that the trial court did not find Williams' expert testimony inadmissible but, rather, granted summary judgment to Perfection because Williams' *evidence of damages* to the Tank Manufacturers' reputation was speculative. In other words,

summary judgment is proper because there is no disputed fact that the Tank Manufacturers cannot show the existence of lost profits as a result of damage to their reputation, notwithstanding the methodology used. The present case is distinguishable from *Donaldson* in this important aspect: In *Donaldson*, there was no dispute over the *evidence* that the children suffered from cancer, only whether the *cause* could be linked to the coal tar leakage.

■ The party who seeks damages has the burden not only to establish that he sustained damages, but also to establish a reasonable basis for computation of those damages. Damages may not be awarded on the basis of speculation and conjecture. *Finance America Commercial Corp. v. Econo Coach, Inc.*, 118 Ill. App. 3d 385, 390, 454 N.E.2d 1127, 1131 (1983). The present case is distinguishable from *Donaldson* in one important aspect: In *Donaldson*, there was no dispute over the *evidence* that the children suffered from cancer, only whether the *cause* could be linked to the coal tar leakage. The Tank Manufacturers' "evidence" of consumer complaints and news media coverage about the failure of dip tubes does not constitute actual financial damages to their respective companies as a result of "aspersions cast" upon them by these sources.

Moreover, Dr. Williams' conclusions need not be accepted on summary judgment because they do not constitute competent evidence capable of raising a genuine issue of material fact for trial pursuant to Supreme Court Rule 191(a):

> "Affidavits in support of and in opposition to a motion for summary judgment under section 2—1005 of the Code of Civil Procedure *** shall not consist of conclusions but of facts admissible in evidence ***." 145 Ill. 2d R. 191(a).

Summary judgment shall be granted "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2—1005(c) (West 2002). The purpose of summary judgment is not to try a question of fact but to determine if one exists. *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 517, 622 N.E.2d 788 (1993). Although a plaintiff is not required to prove his case at the summary judgment stage, in order to survive a motion for summary judgment, the nonmoving party must present a factual basis that would arguably entitle the party to a judgment. *Allegro Services, Ltd. v. Metropolitan Pier & Exposition Authority*, 172 Ill. 2d 243, 256, 665 N.E.2d 1246 (1996). Unsupported assertions, opinions, and self-serving or conclusory statements made in deposition testimony are not admissible evidence upon review of a summary judgment motion. *Davis v. Times*

*Mirror Magazines, Inc.*, 297 Ill. App. 3d 488, 495, 697 N.E.2d 380, 386, *appeal denied*, 179 Ill. 2d 580, 708 N.E.2d 436 (1998).

We agree with Perfection that whether the event study methodology is an accepted theory under *Frye* is not a dispositive issue in the present case. The event study methodology has been universally rejected by federal courts in lawsuits for restitution other than securities fraud class action litigation. In *LaSalle Talman Bank F.S.B. v. United States*, 45 Fed. Cl. 64 (1999), *aff'd in part & vacated in part on other grounds*, 317 F.3d 1363 (Fed. Cir. 2003), the federal appeals court ruled that the government was not permitted to use event study methodology to disprove injury to Talman Bank as a result of the government's breach of contract with Talman under the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA) (Pub. L. No. 101—73, 103 Stat. 183 (1989)). The government contended that an analysis of the impact of FIRREA on the value of Talman's outstanding common stock demonstrated that no damages were due. In support, an expert witnesses testified that an event study of Talman's stock price in the two-week period surrounding the date of enactment of FIRREA demonstrated that plaintiff's market value increased as a direct result of the statute's enactment. The court rejected defendant's event study argument, finding it "flawed conceptually." *LaSalle Talman Bank*, 45 Fed. Cl. at 81. The court declined to accept "this novel method of determining damages for breach of contract, either as a method of determining quantum per se, or as means of refuting plaintiff's calculations of damages under standard contract damages theories." *LaSalle Talman Bank*, 45 Fed. Cl. at 81. While acknowledging that event studies are "a widely used tool in the academic field of economics to assess the impact of an event upon the value of a company's stock" (*LaSalle Talman Bank*, 45 Fed. Cl. at 81; see, *e.g.*, *Galigher v. Jones*, 129 U.S. 193, 32 L. Ed. 658, 9 S. Ct. 335 (1889); *Holland Furnace Co. v. Allen*, 118 F.2d 969 (6th Cir. 1941)), courts have frequently adjudicated breach of contract claims involving companies that are publicly traded and have done so without resorting to the use of event studies. The court noted that the government failed to cite any cases in which a court has adopted an event study to determine the quantum of damages for breach of contract. Courts that have adopted event studies have done so only in stockholder class action or derivative suits alleging fraud-on-the-market. See, *e.g.*, *Goldkrantz v. Griffin*, Fed. Sec. L. Rep. (CCH) par. 90,462 (S.D.N.Y. April 6, 1999); *In re Executive Telecard, Ltd. Securi-*

*ties Litigation*, 979 F. Supp. 1021, 1025-26 (S.D.N.Y. 1997)[2] ; *In re California Micro Devices Securities Litigation*, 965 F. Supp. 1327, 1333 (N.D. Cal. 1997); *In re Seagate Technology II Securities Litigation*, 843 F. Supp. 1341, 1348, 1368 (N.D. Cal. 1994); *In re Oracle Securities Litigation*, 829 F. Supp. 1176, 1181 (N.D. Cal. 1993). In these cases, plaintiffs alleged fraud on the market: fraudulent misrepresentation or concealment of information regarding the defendant that improperly affected its stock price, to the injury of investors who were not aware of the fraud. The plaintiffs alleged they were harmed by purchasing stock at an inflated price, which they could not later recoup after the fraud was discovered. The courts considered event study analyses to support or refute plaintiffs' claims that stock price movements were caused by the fraudulent acts and to measure the quantum of damages. The *LaSalle* court concluded: "This methodology has never been employed to limit damages in the context of a breach of contract claim brought by a corporate plaintiff, as far as the court is aware. We see no reason to extend this concept to the case at hand, and decline to do so." *Lasalle Talman Bank*, 45 Fed. Cl. at 87.

Here, the Tank Manufacturers have presented no evidence that they have suffered economic damage to their business reputations in any amount, let alone $182 million. The record shows that representatives of four Tank Manufacturers testified that they could identify no lost customers, profits, declines in revenues, or loss of sales as a result of the dip tube failure and associated media coverage. A representative of Rheem testified in a deposition that its profits had increased during that period. The Tank Manufacturers' claims, therefore, are entirely dependent on Williams' testimony, which is insufficient to show a *link* between a specific event and loss of profits. The "event window" alleges injury only to shareholders, not to' the corporation. We see no reason to detour from the route of the federal courts and follow their lead in declining to extend the event study methodology to this case to calculate alleged damages to the concept of the "good will" of the Tank Manufacturers. The Tank Manufacturers have failed to point to any evidence of tangible loss of profits. We therefore find that entry of summary judgment in favor of Perfection was proper.

---

[2]The event study was praised by the court as "by far the most thorough, sophisticated and well substantiated plan *in a securities class action.*" (Emphasis added.) *In re California Micro Devices*, 965 F. Supp at 1332.

For the reasons stated above, we affirm the judgment of the trial court.

Affirmed.

O'BRIEN and REID, JJ., concur.