MAURINO R. RICHTON, Plaintiff-Appellee, *v.* GENE FARINA *et al.*, Defendants-Appellants.

(No. 56725; )

First District (5th Division)—September 21, 1973.

*Rehearing denied November 2, 1973.*

698

Mortimer & Hoffman, of Chicago, (J. Stirling Mortimer and Paul R. Hoffman, of counsel,) for appellants.

Morgan, Lanoff, Cook & Madigan, of Chicago, (John A. Cook and Samuel M. Lanoff, of counsel,) for appellee.

Mr. JUSTICE SULLIVAN delivered the opinion of the court:

Plaintiff filed a complaint against 10-Dix Building Corporation (hereinafter called 10-Dix) and Gene Farina, its sole shareholder, seeking: (1) an equal division of 10-Dix corporate stock pursuant to an alleged agreement between him and Farina; (2) an accounting of the profits of 10-Dix; (3) an equal division of the shares of stock held by Farina in the Farbeck Corporation (hereinafter called Farbeck); and (4) participation in the purchase by Farina of the interest of a co-participant, Louis Beckman.

The trial court found in favor of plaintiff and on appeal defendants contend that the court erred: (1) in finding the existence of the contract between plaintiff and Farina; (2) in ordering one third of the capital

stock of 10-Dix to be transferred by Farina to plaintiff upon payment by plaintiff of $333.33 (one half of the amount paid by Farina on the issuance of the capital stock); and (3) in requiring Farina to give an accounting of all transactions of 10-Dix.

Plaintiff cross-appeals contending the court erred: (1) because he was not given the right to participate in the purchase by Farina of the interest of Louis Beckman, another participant; and (2) because the decree fails to specifically provide for an accounting of the transfer without consideration of a lease purchase contract from 10-Dix to Farbeck.

Some time prior to April, 1964, Jewel Tea Company acquired a shopping center known as Wallacetown and its adjacent land in Chicago Heights, Illinois. In furtherance of a plan to develop the center, Jewel sought the assistance of Louis Beckman, a Kankakee real estate developer and investor, who, concurrently, operated in an agency capacity for Allen Bros. and O'Hara, a Tennessee general contractor and developer. Subsequently, on May 2, 1964, a meeting was held in Beckman's office in Kankakee, Illinois at which were present, in addition to Beckman, plaintiff, Farina and two associates of Beckman, Joel Brault and Bill Thompson. Because this meeting is particularly significant, the testimony of the persons present is set forth as follows:

Plaintiff testified that Beckman had called him concerning a building project in Chicago Heights and plaintiff asked Farina to accompany him to a meeting with Beckman in Kankakee; that Beckman had explained he intended to purchase some of the Jewel Tea Company land to erect an office building; that Beckman said the project would involve an expenditure of about $500,000 and that the sharing would be 50% by Beckman and 25% each for plaintiff and Farina; that both he and Farina said they were interested; that Beckman said the "front money" would be $50,000 to $100,000 and plaintiff said he would put up his share; that while he and Farina were driving back to Chicago Heights it was decided that Farina would follow through on the details and that plaintiff would take care of the legal matters.

Farina testified he was asked by plaintiff on May 2, 1964, to ride with him to Kankakee and that while driving there plaintiff discussed his interest in starting a savings and loan in Chicago Heights; that at the meeting Beckman talked about developing a savings and loan and an office building in Chicago Heights; that Beckman said the total cost of an office building would be about $600,000 with front money of about $115,000 to $130,000; that Farina said the site was good and that he would think it over; that on the drive back plaintiff again discussed the savings and loan project.

Beckman testified that he had known plaintiff, having served with him in the State legislature, and that he telephoned him in February or March of 1964 concerning the possibility of an additional development in the Wallacetown shopping center; that they may have discussed a savings and loan in this initial telephone contact; that on May 2, 1964, a meeting was held in his office with the plaintiff, Farina and two of Beckman's associates at which time he explained the possibility of the purchase of land from Jewel Tea Company; that no format for any building was offered by him; that no specifics were discussed at this meeting as to anyone having a particular interest or participation; that the question of participation was left open; that at this meeting he gave some details concerning the possibility of obtaining a ground lease and some details of the requirements, including financial, involved in the development of the building project; that he did not believe the figure of $500,000 was mentioned but that he did suggest the need of "front money" of about $100,000.

Brault testified that he attended the May 2, 1964 meeting for only a short time and that all he remembered was that those present agreed that it was a good idea to look into a building project in Chicago Heights.

Beckman testified that there was a second meeting about one month later in Farina's office at which plaintiff was present. At this second meeting, Beckman testified he expressed his interest in going ahead with the building project and again informed plaintiff and defendant the door was left open for local participation. He also testified that at no time was he present during any discussions concerning specific participation by the plaintiff and that after this second meeting all subsequent meetings were with Farina.

Eventually, an express agreement was entered into between Farina and the Beckman group (Beckman and two of his associates), wherein Farina was to have a two-thirds interest and Beckman's group a one-third interest in the proposed building. Furthermore, the parties, Farina and the Beckman group, decided to utilize the corporate form as the business vehicle for the venture.

Plaintiff testified that shortly before the incorporation of 10-Dix he indicated to Farina his desire to keep his "participation" in the project secret and, to that end, Farina was to hold one-half of the shares of stock issued in Farina's name in trust for plaintiff. Farina denied any such discussion or understanding.

On September 21, 1964, Beckman's attorneys incorporated the venture into the 10-Dix Building Corporation and issued capital stock in accordance with the Farina-Beckman agreement; 666 shares to Farina and

333 shares to the Beckman group.[1] Prior to the incorporation meeting with Beckman's attorneys, Farina had consulted plaintiff in the latter's capacity as an attorney to ascertain whether or not there could be equal voting power in 10-Dix between himself and the Beckman group even though the Beckman group had only a one-third interest. Plaintiff referred the matter to one of his associates and subsequently, on three separate occasions, plaintiff's law firm billed Farina for the work done in response to that request. In November, 1964, plaintiff, Farina and a a member of the Beckman group attended a meeting in the office of Beckman's attorneys for the purpose of discussing the newly formed corporation and various tax ramifications attendant thereto. Farina testified that plaintiff attended the meeting in his capacity as Farina's legal advisor.

In December, 1964, Farina and Beckman flew to Memphis, Tennessee to consummate an agreement with Allen Bros. and O'Hara, the structural contractors of the proposed building. Prior to this trip Beckman queried Farina about the interest of plaintiff in the venture and was informed that plaintiff had no interest. On December 29, 1964, Farina paid $5,000 to Beckman pursuant to an agreement whereby he was to purchase all of the shares of the Beckman group for $35,000 with payment in four installments, the final payment due on January 15, 1966. This agreement was memorialized on March 13, 1965, and further recited that Beckman was to continue his efforts to obtain the land purchase contract with Jewel, the long term financing with Prudential Insurance Company and interim financing.

On February 3, 1965, Beckman obtained a commitment, issued to 10-Dix, from Prudential to loan $550,000 as the permanent financing of the project (commonly referred to as an "end loan"). On February 6, 1965, 10-Dix entered into an agreement with Jewel to purchase land for $40,000 and also entered into an agreement to purchase an adjoining parcel of land for $60,000 payable in monthly installments of $300 of which Farina was to pay $200 and Beckman $100. Farina personally undertook the obligation of becoming the maker on the $40,000 note from American Savings Bank of Chicago Heights. Plaintiff did not prepare or see the documents of purchase and transfer on either of the parcels nor was he aware of the purchase prices involved.

---

[1] Farina paid $666.66 for two thirds of the capital stock. Plaintiff paid nothing. The court ordered plaintiff to pay $333.33 for the one-third interest it found belonged to plaintiff.

Subsequently, numerous efforts were made to obtain interim financing for the building construction and on June 4, 1965, Citizens Federal Savings and Loan Association agreed to loan 10-Dix $350,000. Initially, plaintiff contended that in order to obtain the interim financing a $25,000 deposit was required by Citizens Federal. This $25,000 figure became the focal point in conflicting contentions concerning whether or not plaintiff had contributed a share to the venture. For this reason, the testimony concerning the characterization of the $25,000, which went to 10-Dix, is set forth as follows:

Plaintiff testified that in June, 1965, Farina approached him and indicated it was time for plaintiff to put up his share of the joint venture, $25,000; that Farina called Mario Bruno and asked whether he would lend $25,000 to plaintiff; that Farina told Bruno the money was needed for plaintiff's interest; that the parties met at Bruno's home and the loan was agreed upon with plaintiff giving his individual note for $25,000 and 10-Dix also giving a note for the same amount which Farina co-signed. On cross-examination, plaintiff acknowledged that his law firm prepared the 10-Dix/Farina note that was given to Bruno and plaintiff testified that he never paid anything to Bruno on his note; that his note was never returned to him nor did he have a copy of it; at his deposition on October 31, 1969, he testified that he was not aware at that time of the fact that 10-Dix had repaid the note.

Bruno testified that Farina mentioned to him that plaintiff was having a difficult time securing money and asked Bruno to lend plaintiff the needed funds; that he agreed to do so but asked for guarantors for the loan; he received a note from plaintiff and another from 10-Dix which was co-signed by Farina; a check for the loan, naming 10-Dix as payee, was drawn on the Atlas Blacktop Company, owned by him; that the $25,000 was ultimately paid by 10-Dix; that the notes signed by Farina and the plaintiff had been kept in his safe and after payment by 10-Dix both notes were returned to Farina by his son Raymond, who also testified that he returned the two notes to Farina.

Farina testified that on previous occasions he was made aware of the fact that Bruno, a friend of plaintiff's could loan money should the need arise; that $25,000 was needed to further the completion of the project at the estimated cost; that Farina approached Bruno for a loan in that amount and Bruno agreed to make the loan; that Farina, along with plaintiff, met at Bruno's home and when the loan details were completed Farina asked plaintiff to draw up a promissory note which he did; the $25,000 was made payable to 10-Dix; that plaintiff had no share in the venture and Farina did not ask him to put up the $25,000; that he

did not ask Bruno to loan money to plaintiff; and that he was never in possession of any note signed by plaintiff nor was he aware of any such note.

In June, 1965, Farina and Beckman formed the Farbeck Corporation, its sole asset being the lease purchase contract transferred to it, without consideration from 10-Dix. Farina received two-thirds and Beckman one-third of the shares of Farbeck.

On June 6, 1966, the Prudential Insurance Company loan was fully dispersed as follows:

1. Citizens Federal Savings and Loan Association, $390,454.98;
2. Chicago Title and Trust Company, $23,841.42; and
3. 10-Dix Building Corporation, $135,703.60.

Bruno testified that in September, 1966, Farina informed him that plaintiff had no interest in the corporation and one month later Bruno relayed this information to plaintiff. Plaintiff testified he then contacted Farina and was told that he no longer had any interest, Farina saying: "I had to sell your one-third interest, * * * well, you know I needed money, and I asked you for it, and you didn't give it to me, and I had to go to Detroit." Farina denies any such conversation.

OPINION

Farina first contends the trial court erred in its finding that the litigants had entered into an agreement to undertake the purchase of land and the construction of a building thereon. Plaintiff maintains that a partnership or joint venture agreement resulted from the May 2, 1964 meeting for the construction of a building project to be financed by partnership investment and construction loan credit, after which permanent financing would return the original investment plus the ultimate ownership of the mortgaged property. Further, he argues that all subsequent undertakings, either individually or through the corporate form, were to benefit the parties in direct proportion to their interests in the venture.

■■ The relationship allegedly created by the May 2, 1964 meeting is designated by the plaintiff in his brief here as "a partnership in a joint venture." He asserted, and the trial court confirmed, that the parties had reached a meeting of the minds in the formation of a joint venture. We note that joint ventures have, in general, the legal incidents of a partnership. *Maimon v. Telman*, 40 Ill.2d 535, 240 N.E.2d 652.

Although precise definition is difficult, a joint venture is generally defined as "an association of two or more persons based on a contract who combine their money, property, knowledge, skill, experience, time or other resources in the furtherance of a particular project or undertaking usually agreeing to share the profits and the losses, and each having

some degree of control over the venture." Williston, *Contracts,* sec. 318 (3d ed. 1959).

■■ Essential to the creation of a joint venture is the existence of a contract between the parties. A joint venture is not a status created or imposed by law, but is a relationship voluntarily assumed and arising wholly *ex contractu* and the relationship is a matter of intent as between the parties with such intention being determined in accordance with the ordinary rules governing the interpretation and construction of contracts. (*Carroll v. Caldwell,* 12 Ill.2d 487, 147. N.E.2d 69.) Accordingly, the contract may be express or it may be implied from the facts and circumstances showing that such an enterprise was, in fact, entered into. *Reese v. Melahn,* 53 Ill.2d 508, 292 N.E.2d 375; *Ditis v. Ahlvin Construction Co.,* 408 Ill. 416, 97 N.E.2d 244.

The law is well settled that in order for a contract to come into being there must be a meeting of the minds to the contract. (*Bailey v. Eater,* 53 Ill.App.2d 37, 202 N.E.2d 656; *Maloney v. Crest Finance Co.,* 39 Ill. App.2d 378, 188 N.E.2d 739.) In *Bartlett v. Lauff,* 271 Ill.App. 551, 554, it was stated:

> "It is not enough that parties, circumstances, and possible considerations are present at the same time and place, to make a contract. There must be a common definite meeting of intent of two parties, in selecting or accepting from the elements of contract present, those items essential to a complete contract, as their contract.
>
> \* \* \*
>
> A feeling of certainty even, in the mind of the observer, that a party in position to contract would surely agree to terms present in the situation disclosed, does not evoke a contract from a plausible situation for contract. The agreement must actually be made by the parties to the alleged contract. It must be shown that those parties selected and concurred in the terms of contract, or no contract exists."

■■ The conflicting testimony of plaintiff and Farina regarding the discussions and conclusions of the May 2nd meeting, juxtaposed with the testimony of Beckman that he was unaware of plaintiff's interest throughout Beckman's involvement in the venture, does, in our opinion, belie the existence of an express agreement to enter into a joint venture. Another factor, which militates against plaintiff's contention of an oral agreement, is that he is an attorney who has been practicing law since 1942, a practice which included drafting of business agreements. Not only was a formation agreement absent, but there was nothing in writing between the parties substantiating any of the contentions of the plaintiff regarding the stock transference or, in general, any of the subsequent

transactions between plaintiff and Farina. Their absence is a significant indication that there was no oral agreement. (*Patek v. Patek*, 263 Ill. App. 487.) Accordingly, from our examination of the trial record we are of the opinion that the evidence fails to establish an express agreement to form a joint venture.

We turn now to the determination of whether there was an implied agreement and we note that in *Reese v. Melahn*, 53 Ill.2d 508, 513, 292 N.E.2d 375, the court quoted from *Ditis v. Ahlvin Construction Co.*, supra, as follows:

> "'In a court of equity, the substance of the transaction, and not the form, is to be regarded in the determination of the rights of the parties. [Citation.] A joint adventure may be established without any specific formal agreement to enter into a joint enterprise * * *. It is the nature of the enterprise undertaken that controls, not the form of the agreement.'"

In *United States ex rel. J. C. Schaefer Electric, Inc. v. O. Frank Heinz Construction Co.*, 300 F.Supp. 396, 399 (S.D. Ill. 1969), it was said:

> "An implied contract is proven by circumstances showing that parties intended to contract or by circumstances showing a general course of dealing between the parties; and an agreement may be said to be implied when it is inferred from the acts of the conduct of the parties * * *."

We believe that the history of the dealings between the parties denies the existence of an implied contractual undertaking. It is true that plaintiff did bring the parties together and participated in discussions at the first meeting pertaining to the proposed building; nevertheless, his lack of participation in regard to the substantive aspects of the venture, e.g., management, control, contractual matters, finances and rental, all override and negate the existence of the proffered joint venture relationship. Specifically, plaintiff, an attorney, neither drafted nor read the contracts entered into between 10-Dix and Jewel for the "end loan" and, further, exhibited a lack of knowledge concerning the development and construction costs of the project. Although he professed to donate his legal services as part of the joint venture, the record indicates he rendered little, if any, such service. Moreover, when plaintiff's advice was solicited by Farina concerning the 10-Dix incorporation, and an advisory opinion given by an associate, plaintiff's firm, on three separate occasions, billed Farina for the opinion.

■■ While we are apprised of the fact that one joint venturer need not know of the existence of a fellow joint venturer, we must weigh heavily Beckman's unawareness of plaintiff's interest in deciding whether the transactional sequence of events were sufficient to infer a contract which

in turn would evidence the intention of the parties to join together. In this regard, in addition to the requirement that a joint venture must have a contractual basis, either express or implied, we note that the decisions are in substantial agreement that the following factors must also be present: (a) a community of interest, (b) a proprietory interest in the subject matter, (c) a right to govern the policy in connection therewith, and (d) a sharing in both the profit and losses. (*Carroll v. Caldwell*, 12 Ill.2d 487, 147 N.E.2d 69; *Hagerman v. Schulte*, 349 Ill. 11 181 N.E. 677; Williston, *Contracts*, sec. 318A (3d ed. 1959).) We believe the record here does not reveal the presence of these factors.

In *Schmalzl v. Derby Foods, Inc.*, 341 Ill.App. 390, 94 N.E.2d 86, it was said "in a joint venture there must be community of interest in the purposes of the undertaking and some right to direct and govern the movements and conduct of each other in connection therewith." Here, plaintiff clearly exercised no such control and we believe that there must be something more than is found here, *i.e.*, some active participation in the enterprise; some control over the subject matter involved. Farina's conduct and his autonomous actions in dealing with the corporation, considered with the absence of any involvement by plaintiff, leave the conclusion that plaintiff had no right to direct or govern the policy of the joint venture.

We believe, therefore, that the cumulative effect of what transpired between the parties did not give rise to sufficient facts and circumstances necessary to imply a joint venture agreement. There is little in the record, not even from the testimony of plaintiff, which suggests a pooling of efforts, of a mutual right to control the carrying out of the transaction, a sharing of losses or a joining of interests, risks and skills. The $25,000 Bruno loan to 10-Dix remains as the final indicia of plaintiff's interest in the joint venture. Neither his original note nor a copy was in existence at the time of trial. Plaintiff argues that he gave his note for the $25,000 and this represented his interest in the corporation and was his required contribution to the venture. Farina denies that plaintiff made any loan to 10-Dix or gave any note therefore. It is undisputed that Bruno asked for and was given a note from 10-Dix, prepared by plaintiff at the request of Farina, which was guaranteed by Farina and his wife and that the loan was repaid in installments by Farina through 10-Dix with the last installment paid on July 11, 1966. It is also undisputed that plaintiff was unaware the note had been repaid at the time of his deposition on October 31, 1969. The deficiencies outlined above, coupled with the absence of any concrete evidence establishing plaintiff and not Farina as the maker of the $25,000 loan, negate the agreement asserted by plaintiff.

We have already found there was no express agreement to embark upon a joint venture and, we believe, from our examination of the record, that the facts and circumstances do not imply its creation. We conclude, therefore, that the trial court's finding of an agreement between plaintiff and Farina wherein each owned a one-half interest in the venture for the construction of the building here involved, was against the manifest weight of the evidence. *Chapman v. Huttenlocher*, 125 Ill.App.2d 39, 259 N.E.2d 836.

In view thereof, we further hold that no fiduciary relationship existed between plaintiff and Farina and we find that the trial court erred in ordering the transfer of 10-Dix Building Corporation stock to plaintiff and in requiring Farina to account for all transactions of 10-Dix.

■■ In his cross-appeal, plaintiff contends the court erred (1) in denying him the right to participate in the purchase by Farina of the interest of Louis Beckman, and (2) in failing to require an accounting of the transfer by 10-Dix to Farbeck of the lease purchase contract. Since we have determined that there was no agreement between plaintiff and Farina, the plaintiff had no interest in 10-Dix Corporation and the purchase by Farina of Beckman's interest and the transfer by 10-Dix of the lease purchase agreement were not to the plaintiff's detriment. We find no error in the trial court's finding denying plaintiff the right to participate in the purchase by Farina of Beckman's interest and we find that the trial court properly refused to require an accounting of the lease purchase contract.

Accordingly, this case is reversed and remanded with directions to enter a judgment not inconsistent with this opinion.

Reversed and remanded with directions.

DRUCKER, P. J., and LORENZ, J., concur.