In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-2811

DYNEGY MARKETING AND TRADE,
a Colorado Partnership,

*Plaintiff-Appellee*,

*v.*

MULTIUT CORPORATION, an Illinois Corporation,
and NACHSHON DRAIMAN, an Illinois Resident,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 7446—**John A. Nordberg**, *Judge.*

ARGUED JANUARY 12, 2011—DECIDED AUGUST 4, 2011

Before KANNE and TINDER, *Circuit Judges*, and
HERNDON, *District Judge.*[*]

_____

[*] The Honorable David R. Herndon, Chief Judge of the United
States District Court for the Southern District of Illinois,
sitting by designation.

TINDER, *Circuit Judge.*    The relationship between Dynegy Marketing and Trade ("Dynegy"), a natural gas supplier, and Multiut Corporation, a natural gas distributor headed by Nachshon Draiman, has become as volatile as the commodity in which they once dealt. Dynegy and Multiut adhered to their written contract for a time, but their relationship unraveled in the face of a failed acquisition, several million dollars' worth of unpaid invoices, and frequent disputes over pricing, which were later inflamed by allegations that Dynegy and other natural gas suppliers were manipulating the indices on which natural gas price quotes are based. When Multiut's outstanding bills remained unpaid notwithstanding Draiman's personal guaranty, Dynegy cut off Multiut's gas supply and brought suit, alleging breach of contract and guaranty as well as fraudulent transfer claims. Multiut and Draiman fired back with six counterclaims, which included a number of contract-related claims and a Robinson-Patman antitrust claim. After contentious discovery, Dynegy moved for summary judgment on its contract and guaranty claims and all of the defendants' counterclaims. Multiut and Draiman tried to oppose summary judgment by submitting a declaration from Draiman, but the district court excluded the declaration as a sanction for Multiut's discovery violations. The district court granted Dynegy's summary judgment motion and ultimately issued a Rule 54(b) judgment on the contract and guaranty claims and the counterclaims. Multiut and Draiman filed two motions to reconsider, but the district court denied both motions and rejected their belated submission of

affidavits relating to the alleged price index manipulation. Multiut and Draiman challenge nine of the district court's rulings. We affirm in full.

## I. Background

Draiman solely owns and controls Multiut, an Illinois corporation that acts as a middleman between utility providers and end-users. Multiut obtains wholesale quantities of natural gas from national suppliers and allocates the gas to its smaller local customers. Dynegy, a Colorado partnership that markets energy products, is the main supplier from which Multiut obtained gas. Multiut first established a contractual relationship with Dynegy's predecessor-in-interest, Natural Gas Clearinghouse, in 1988. In 1994, Multiut and Dynegy entered into a Natural Gas Sales Agreement ("the agreement"). (Technically, Multiut entered into the agreement with Natural Gas Clearinghouse, but the parties agree that Dynegy, as Natural Gas Clearinghouse's successor, is bound by the agreement.) Pursuant to the agreement, Multiut would contact Dynegy periodically and make "nominations" of natural gas, measured in units called "therms." Dynegy would quote Multiut a price, based on an applicable natural gas index, and if Multiut accepted the price Dynegy would pipe the gas to an agreed-upon delivery point and send monthly invoices to Multiut, which was obligated to pay for the gas delivered. Its obligation was backstopped both by an interest provision in the agreement and a separate personal guaranty Draiman executed in 1995. The parties were supposed to

formally memorialize their transactions by completing forms called "Exhibit Bs," but in practice the invoices were typically the only written records.

The parties' arrangement worked well enough that Dynegy expressed an interest in acquiring Multiut in 1997. The parties signed a confidentiality agreement and conducted due diligence, but Dynegy ultimately bowed out of the deal. It instead created a joint venture, Nicor Energy, with one of Multiut's competitors, Nicor, Inc. Dynegy began providing natural gas to Nicor Energy in 1998, which Multiut and Draiman pinpoint as the beginning of the demise of the Dynegy-Multiut relationship. Multiut claims that Dynegy gave Nicor Energy sweetheart pricing, in violation not only of the antitrust laws but also of an alleged oral contract promising Multiut "most-favored nations" or "best" pricing.

Notwithstanding its apparent dissatisfaction with Dynegy and Nicor Energy, Multiut continued buying gas almost exclusively from Dynegy and making "progress payments" toward its balance owed. Multiut hit a few financial bumps, however, and by December 2000 owed Dynegy at least $1,620,178 in payments and interest. Multiut's bookkeepers met with representatives from Dynegy in March 2001 and agreed that Dynegy's calculation of the arrearage was accurate despite Dynegy's failure to include interest on Multiut's invoices during most of 1999 and 2000. From roughly that point forward, Dynegy refused to offer Multiut monthly price quotes; to mitigate its risk, it would agree only to provide Multiut gas on a day-to-day basis. Multiut

preferred longer-term, fixed-price deals, however, so as to better hedge its own risk against fluctuating energy prices and manage customers with whom it had entered into fixed-price contracts. It made repeated efforts to persuade Dynegy to offer it longer-term price guarantees. In June 2001, Draiman sent Dynegy an unsolicited fax stating, "This is to confirm the Multiut order for 12 months. A total of 8 million therms (800,000 MMBTU's) @ _____." Dynegy did not send a return fax, but Draiman testified that he spoke with Dynegy employee Mark Ludwig and gleaned that Multiut "would have to wait a little bit of time to bring some of the balance down" before fixed pricing would be available.

Draiman again sought fixed pricing at a September 2001 meeting with Dynegy employees Ludwig and Pete Pavluk. According to Draiman, Pavluk and Ludwig told him they would "work on" locking-in a fixed price, or that they "would get it done." They also asked him to develop a payment schedule to address Multiut's growing arrearage. By letter dated September 17, 2001, Draiman proposed a tentative payment schedule and added for Dynegy's review "a report of customers on Fixed Cost contracts." Draiman noted that these customers were committed to paying Multiut an average of 47.5 cents per therm and expressed interest in acquiring gas from Dynegy at a fixed price of 30 cents per therm to "insure [Multiut] an additional annual profit of 2,000,000." Dynegy responded by letter dated October 4, 2001, explaining that its relationship with Multiut had become "one of concern" and requested a

"detailed formal payment plan by no later than Wednesday, October 10, 2001." It did not mention Draiman's fixed-price proposal. Draiman testified that he nonetheless relied on Ludwig and Pavluk's assurances and did not seek out alternative sources of gas for Multiut.

Though it proposed a payment plan (on October 12), Multiut continued to fall further behind in its payments as wholesale natural gas prices climbed above the prices it was receiving from its own fixed-price customers. Dynegy kept the gas flowing (and arrearage growing) for another year but shut off the spigot in December 2002 after filing suit against Multiut and guarantor Draiman.

Multiut and Draiman responded by denying Dynegy's allegations and raising affirmative defenses to its breach of contract and breach of guaranty claims. They also filed a bevy of counterclaims against Dynegy. Those relevant here alleged that Dynegy breached the 1997 confidentiality agreement by "inevitably disclosing" to Nicor Energy valuable information it had obtained from Multiut; breached an oral agreement to supply gas at fixed prices; breached an implied agreement not to charge interest; breached an oral agreement to offer "most favored nations" pricing; and violated the Robinson-Patman Act, 15 U.S.C. § 13(a), by offering lower gas prices to Multiut's competitors.

In March 2003, the Federal Energy Regulatory Commission (FERC) issued a lengthy report summarizing its year-long investigation of energy markets in the western United States. *See* Staff of the Federal Energy Regulatory

Commission, *Final Report on Price Manipulation in Western Markets* (2003), *available at* http://www.ferc.gov/industries/ electric/indus-act/wec.asp ("FERC report"). According to the FERC report, which was commissioned to "determine whether and, if so, the extent to which California and Western energy markets were manipulated during 2000 and 2001," *id.* at ES-1, "[d]ysfunctions in the natural gas market appear to stem, at least in part, from efforts to manipulate price indices compiled by trade publications," *id.* Dynegy was one of many energy firms implicated in the alleged price index manipulation. The FERC report quoted several Dynegy employees, who stated they felt pressured to report inflated volumes or prices to the industry-produced indices, *see id.* at III-5, which were the bases for the prices Dynegy and other suppliers charged their customers, including Multiut. The FERC report highlighted Dynegy's alleged manipulations in Oregon and San Francisco, but did not mention Dynegy in connection with "the Great Lakes" or Chicago. *See id.* at III-54.

After the FERC report became public, Multiut sought in discovery information and documents regarding Dynegy's calculation and reporting of price index information. Dynegy opposed its efforts. The magistrate judge overseeing discovery determined that Dynegy was not required to supplement its responses to these requests because "Multiut has not provided any basis for the assertion that Dynegy could independently influence the index price."

Dynegy eventually moved for summary judgment on Multiut and Draiman's counterclaims and its own

breach of contract and guaranty claims. (Dynegy's fraudu-
lent transfer and breach of fiduciary duty claims were
not included in the summary judgment motion and are
not part of this appeal.) As part of their response to
Dynegy's statement of undisputed facts, Multiut and
Draiman submitted for the district court's consideration,
notwithstanding its discovery rulings, excerpts from
the FERC report, documents from a related criminal
proceeding against one of Dynegy's former traders, and
a lengthy declaration by Draiman. The declaration
from Draiman contained Multiut and Draiman's first
and only estimates of Multiut's lost profits and some of
its other alleged damages.

Pointing to the untimeliness of the Draiman declara-
tion and Multiut's failure to comply with Fed. R. Civ.
P. 26(a)(1)(A)(iii) & (e), which require parties to dis-
close and supplement "a computation of each category
of damages," Dynegy argued that the declaration should
be excluded pursuant to Fed. R. Civ. P. 37(c)(1). The
district court agreed and excluded the declaration in
its entirety. It also granted in full Dynegy's motion for
summary judgment. Draiman and Multiut moved for
reconsideration. In their motion, they asserted that the
"centerpiece" of their opposition to the breach of
contract claim was "evidence that Dynegy had system-
atically overcharged Multiut for its natural gas pur-
chases due to its complicity in a nationwide conspiracy
to inflate gas index prices" and argued that the price
manipulation evidence was relevant. They also chal-
lenged Dynegy's computation of damages, which was
based on an expert's review and analysis of invoices and

payment records largely produced by Multiut. Dynegy responded with a Rule 54(b) motion for entry of final judgment on the claims and counterclaims resolved by the summary judgment order.

After considering briefing on both motions, the district court denied Multiut's motion and granted Dynegy's. The district court found that reconsideration was not appropriate because Multiut had done little more than rehash its previously rejected arguments. The district court also rejected for want of evidence Multiut's assertion that the price index manipulation in California and other western states "carried over" into the Chicago market, though it recognized that such a conclusion was "not illogical." The district court granted Dynegy's Rule 54(b) motion after finding that the fraudulent transfer claims were legally and factually distinct from the other claims and that there was no just reason for delay.

Multiut and Draiman promptly appealed. We dismissed the appeal for lack of jurisdiction, however, because the district court's judgment did not specify the amount of pre-judgment interest the defendants owed and was therefore not final. *See Osterneck v. Ernst & Whinney*, 489 U.S. 169, 175-76 (1989). The case therefore returned to the district court, whereupon Dynegy filed a Rule 60(a) motion to amend the judgment to include interest calculated pursuant to a formula in the agreement. Multiut and Draiman retorted that any interest due should be calculated pursuant to an Illinois statutory provision. They also filed a second motion to

reconsider the grant of summary judgment and moved to supplement the record with affidavits from former Dynegy employee Jeffrey Hornback and economist Michael Harris. Multiut and Draiman argued that these affidavits, which they obtained in connection with ongoing multi-district litigation prompted by the FERC report, *see In re W. States Wholesale Natural Gas Antitrust Litig.*, 290 F. Supp. 2d 1376 (J.P.M.L. 2003), supported their contention that the prices Dynegy charged for natural gas were "artificially influenced or contaminated by plaintiff's wrongful conduct."

The district court denied the defendants' second motion for reconsideration. It cited finality concerns as well as hesitation to "construe [the remand order from the Seventh Circuit] as an open invitation to allow the parties to delve back into the substantive issues of the case." The district court granted Dynegy's Rule 60(a) motion to amend the judgment and sided with Dynegy as to the method by which the interest should be computed. The district court entered judgment for Dynegy, awarding it $8,929,449 in pre-judgment interest on top of its damages of $13,693,943.18, for a total of $22,623,392.18. Multiut and Draiman promptly appealed.

## II.  Discussion

Multiut and Draiman have presented nine issues for our consideration, disregarding our repeated counsel that "the equivalent of a laser light show of claims may be so distracting as to disturb our vision and confound our analysis." *United States v. Lathrop*, 634 F.3d 931, 936 (7th

Cir. 2011) (collecting cases), *petition for cert. filed*, No. 10-11044 (U.S. June 13, 2011); *see also Cole v. Comm'r*, 637 F.3d 767, 772 (7th Cir. 2011) (noting that the "scattergun approach" generally does not serve appellants well). Not only does the "kitchen sink" approach to briefing cause distraction and confusion, it also "consumes space that should be devoted to developing the arguments with some promise." *Howard v. Gramley*, 225 F.3d 784, 791 (7th Cir. 2000). We focus on the minimally developed claims as best we can, grouping like contentions where possible and addressing the many claims of error in turn.

## A. Exclusion of Draiman Declaration

As part of their response to Dynegy's summary judgment motion, Multiut and Draiman submitted a seventeen-page declaration by Draiman. They submitted the declaration many months after discovery closed, but relied on it to prove the damages they allegedly suffered at Dynegy's hand. The district court declined to consider the declaration "because Multiut failed to make timely disclosures [of its computation of damages] during discovery." It reasoned, "Multiut has not provided any explanation for its failure to make earlier disclosures, and to allow it to make late disclosures now, after a lengthy discovery process, would prejudice Dynegy." Multiut and Draiman disagree with this reasoning. They contend that their failure to produce the Draiman declaration more expediently was harmless because the information it contained was otherwise made available to Dynegy.

Rule 26(a)(1)(A)(iii) of the Federal Rules of Civil Procedure requires litigants to disclose to one another "a computation of each category of damages claimed by the disclosing party—who must also make available . . . the documents or other evidentiary material . . . on which each computation is based, including materials bearing on the nature and extent of injuries suffered." Rule 26(e)(1) requires parties to supplement their initial disclosures as more information becomes available to them. If a party does not follow these rules, "the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or was harmless." Fed. R. Civ. P. 37(c)(1). Whether a failure to comply with Rule 26(a) or (e) is substantially justified, harmless, or warrants sanctions is left to the broad discretion of the district court. *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003); *cf.* Fed. R. Civ. P. 37(c)(1)(A)-(C) (listing sanctions courts may impose). "[W]e review all discovery sanctions for abuse of discretion and will uphold a district court's decision so long as it could be considered reasonable." *Collins v. Illinois*, 554 F.3d 693, 696 (7th Cir. 2009).

Multiut and Draiman do not challenge the district court's conclusion that they violated Rule 26, nor do they contend that they were justified in doing so. They argue only that their violation should be excused because it was harmless: they assert that information relating to damages contained in the declaration was made available to Dynegy "in light of the exhaustive documentation produced by Multiut during discovery and the

extensive deposition testimony of Draiman and [expert] James Alerding on the subject of damages." This argument cannot carry the day logically (if the information contained in the declaration is already in the record, then there should be no problem with the district court's decision to exclude the declaration) or legally.

Multiut and Draiman started off discovery on the right foot by providing Dynegy with rough estimates of the damages associated with their counterclaims in their original disclosures. At that time, they averred, "As a result of Dynegy's breach of an agreement to supply gas at a fixed price, Multiut has sustained damages in an amount that Multiut believes exceeds $6 million. Multiut will supplement with a computation of these damages when they are ascertained through the course of continuing discovery." They made a similar statement with respect to their breach of confidentiality agreement counterclaim, for which they estimated at least $1 million in damages. But even after Dynegy filed several motions to compel and repeatedly sought (and occasionally obtained) sanctions, Multiut and Draiman failed to disclose how they arrived at those numbers. Even if we fully credit the defendants' contention that the numerical information in Draiman's declaration was duplicative of that already disclosed in spreadsheet form, nothing in the record—not even Draiman's declaration—shines light into the black box of their damages calculation process. A reasonable district court could and did conclude that exclusion of the declaration, which contained the only ballpark estimates of Multiut's lost profits and alleged credits due, was an appropriate sanc-

tion for the defendants' continued dilatory and opaque behavior. Without an idea of where the defendants' numbers were coming from, Dynegy was unable to investigate and raise arguments against the claimed damages; the district court did not err in concluding the omissions were not harmless.

## B. Breach of Oral & Implied Contract Counterclaims

Multiut and Draiman assert that the relationship between Dynegy and Multiut ran deeper than the pages of their written agreement. According to Multiut and Draiman, Dynegy and Multiut were also bound by three unwritten contracts: two oral and one implied in fact. Pursuant to the first alleged oral contract, Dynegy agreed to offer Multiut "most-favored-nations" pricing. That is, it agreed to charge Multiut "(i) a price equal to or ½ cent per therm higher than the index price, or (ii) the lowest price contemporaneously being charged by Dynegy to any of Multiut's competitors." Pursuant to the second alleged oral contract, Dynegy agreed to lock-in the price it charged Multiut for gas such that the fixed price Multiut was obligated to pay Dynegy was less than the fixed prices Multiut's customers were obligated to pay it. Pursuant to the alleged implied-in-fact agreement, Dynegy implicitly agreed to waive Multiut's obligation to pay interest on its arrearage, as evidenced by the omission of interest charges from several months' worth of invoices. The district court concluded that there was no evidence establishing the existence of the alleged agreements and granted summary judgment in

Dynegy's favor on all three counterclaims. We review these decisions de novo, drawing every reasonable inference in Multiut and Draiman's favor. *E.g.*, *India Breweries, Inc. v. Miller Brewing Co.*, 612 F.3d 651, 658 (7th Cir. 2010). We apply the substantive law of the state of Illinois. *See id.* (citing *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938)).

### 1. Oral "Most-Favored-Nations" Contract

Multiut claims that it had an "understanding," dating back to "the mid-1990s," that Dynegy would charge it either "(i) a price equal to or ½ cent per therm higher than the index price, or (ii) the lowest price contemporaneously being charged by Dynegy to any of Multiut's competitors." It alleges that Dynegy fostered this understanding by repeatedly assuring one of Multiut's employees that Multiut was "getting the best price there is," though it acknowledges that Dynegy refused its requests to include a most-favored-nations clause in either the 1988 or 1994 agreements. Multiut claims that Dynegy violated part (i) of the understanding by charging Multiut five to twelve cents more than the index price per therm, and violated part (ii) by charging Multiut's competitor Nicor Energy lower prices than it charged Multiut.

Unilateral "understandings" are not enough to give rise to an enforceable oral contract in Illinois. "A feeling of certainty . . . that a party in position to contract would surely agree to terms present in the situation disclosed, does not evoke a contract from a plausible situation

for contract. The agreement must actually be made by the parties to the alleged contract. It must be shown that those parties selected and concurred in the terms of the contract, or no contract exists." *Richton v. Farina*, 303 N.E.2d 218, 223 (Ill. App. Ct. 1973) (quoting *Bartlett v. Lauff*, 271 Ill. App. 551, 554 (Ill. App. Ct. 1933)). "In order for there to be a contract between parties there must be a meeting of the minds or mutual assent as to the terms of the contract." *Midland Hotel Corp. v. Reuben H. Donnelly Corp.*, 515 N.E.2d 61, 65 (Ill. 1987). No reasonable jury could find any such meeting or mutual assent here. Although Multiut has asserted that the "essential terms" of the alleged contract were "definite and certain," *id.*, it has not pointed to any evidence from which a jury could infer that Dynegy assented to them. Vague statements about "best" prices do not an agreement make, particularly where the proponent of the contract cannot pinpoint even the year in which the agreement was purportedly reached. Nor does the parties' course of conduct tally with the existence of such an agreement; if Multiut were guaranteed a per-therm price of index plus ½ cent, there would have been no reason for it to get price quotes from Dynegy or repeatedly seek fixed pricing. Summary judgment was properly entered in Dynegy's favor on this counterclaim.

### 2. Oral Contract to Lock-in Prices

The second alleged oral contract also involves the prices Dynegy promised to offer Multiut. During a September 2001 meeting with Dynegy employees, Draiman

floated the idea of locking-in Multiut's pricing for an extended period of time. He testified that the Dynegy employees said "something along th[e] lines" of they would "work on it" or "would get it done" and requested a list of Multiut's customers and profit margins. Draiman testified that although Dynegy did "not explicitly" agree to lock-in a price, he walked away from the meeting with the "impression and understanding" that Multiut would be getting fixed prices "for whatever period [its own fixed-price] contracts were." Based on that understanding, Multiut did not seek out other sources of natural gas for its fixed-price customers. On September 17, 2001, Draiman sent a letter to Dynegy in which he provided for Dynegy's "review" a list of the prices paid by Multiut's fixed-price customers and pointed out that if Multiut could lock-in a price of about 15 cents per therm below what its average customer was paying, it could increase its profits by $2 million. Dynegy's response to the letter did not mention fixed prices, and Draiman took no further steps to ensure that Multiut would actually receive locked-in prices. The district court concluded that this evidence was not enough to show that Dynegy agreed to provide gas at a set price and granted summary judgment.[1] We agree that summary judgment is warranted.

---

[1] The district court also found summary judgment warranted on the "separate and independent" ground that Multiut failed to offer evidence of its damages stemming from the alleged breach. We need not address that ground here.

The evidence Multiut and Draiman presented does not demonstrate the existence of an agreement between Dynegy and Multiut. Multiut was able to more precisely identify the timeframe in which the alleged agreement was reached, and the actors who allegedly made it, but there is no evidence as to what price the agreement locked in or how long the agreement was in effect. "The essential terms of a contract must be definite and certain in order for a contract to be enforceable." *Midland Hotel Corp.*, 515 N.E.2d at 314. Both price and duration are unquestionably "essential terms," at least in this sort of contract. Even if a jury ignored Dynegy's oral use of prospective preliminary language, *cf. Ocean Atl. Dev. Corp. v. Aurora Christian Schs., Inc.*, 322 F.3d 983, 995-96 (7th Cir. 2003) (applying Illinois law) ("[A] letter of intent or a similar preliminary writing that reflects an agreement contingent upon the successful completion of negotiations that are ongoing, does not amount to a contract that binds the parties."), and concluded that an agreement had been reached during or after the September meeting, it would be unable to glean from the evidence presented the parameters or duration of that agreement. "[I]f the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." *Acad. Chi. Publishers v. Cheever*, 578 N.E.2d 981, 984 (Ill. 1991).

### 3. Implied Contract to Waive Interest

The third unwritten contract purportedly governing Dynegy and Multiut's relationship grew out of Dynegy's

failure to invoice Multiut for interest during most of 1999 and 2000. Multiut and Draiman contend that through this conduct, Dynegy impliedly agreed to forgo the collection of interest, notwithstanding its subsequent submission to Multiut of corrected interest invoices and supporting schedules. The district court granted summary judgment for Dynegy after finding that Multiut and Draiman failed to demonstrate that any such agreement existed. We agree that summary judgment was proper.

"Contracts implied in fact arise under circumstances which, according to the ordinary course of dealing and the common understanding of men, show a mutual intention to contract." *Mowatt v. City of Chicago*, 127 N.E. 176, 177 (Ill. 1920); *see also Schivarelli v. Chi. Transit Auth.*, 823 N.E.2d 158, 165-66 (Ill. App. Ct. 2005) ("In a contract implied in fact, a contractual duty is imposed by reason of a promissory expression inferred from facts, circumstances and expressions by the promisor showing an intent to be bound. Such contract may be proved by circumstances showing that the parties intended to contract and by the general course of dealing between them." (citation omitted)). No such intention can be reasonably inferred from the evidence presented here. Despite its failure to invoice interest for many months, Dynegy sought to rectify its mistake by sending Multiut a letter and updated invoices as soon as it discovered the omission. (The parties' written agreement contained a provision allowing the parties up to 24 months to correct any billing errors.) It also invoiced Multiut for interest consistently both before and after the 1999-2000 period.

These are not the actions of a party seeking to be bound. Moreover, and perhaps more damaging to this claim, Multiut met with Dynegy in March 2001 and agreed that it owed the amount Dynegy claimed it did; the agreed-upon amount included the interest Multiut now claims is waived. Perhaps Multiut hoped that Dynegy would overlook some of the interest it was accruing, but Dynegy's actions do not objectively indicate that it had any such intention.

### C. Breach of Contract & Guaranty Claims

The district court granted summary judgment in Dynegy's favor on both its breach-of-contract and breach-of-guaranty claims. Summary judgment is appropriate if the admissible evidence considered as a whole shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a), even after all reasonable inferences are drawn in the nonmovant's favor. We review de novo the district court's determination that this standard has been met. *E.g.*, *Davis v. Time Warner Cable of Se. Wis., L.P.*, ___ F.3d ___, No. 10-1423, 2011 WL 2611303, at *5 (7th Cir. July 5, 2011).

### 1. Breach of Contract

Multiut and Draiman take an unusual tack in challenging summary judgment on the breach-of-contract claim. Rather than dispute the validity of the agreement, Dynegy's interpretation of its provisions, or Dynegy's

allegations that Multiut was in breach, they contend that Dynegy is not entitled to recover damages because it offered insufficient proof of those damages, participated in improper manipulation of natural gas price indices, and breached other alleged oral and implied contracts. Though novel, none of these arguments gets Multiut and Draiman past the absence of evidence demonstrating a genuine issue for trial.

Multiut and Draiman first contend that Dynegy inadequately proved its damages because it based its calculations not on (largely nonexistent) Exhibit Bs but instead had an expert review invoices and tabulate a total due. Under Illinois law, plaintiffs alleging breaches of contract "bear[ ] the burden of proving that [they] sustained damages resulting from the breach and establishing both the correct measurement of damages and the final computation of damages based on that measurement." *Ollivier v. Alden*, 634 N.E.2d 418, 422 (Ill. App. Ct. 1994). Plaintiffs are not required to prove damages to the exact cent; they must merely establish a "reasonable basis for computing damages," *Razor v. Hyundai Motor Am.*, 854 N.E.2d 607, 626 (Ill. 2006) (quotation omitted), and may do so "in any reasonable manner," *id.* at 627. Here, the record unequivocally indicates that Dynegy did just that. It provided a qualified expert with invoices from Multiut's as well as its own records, and the expert checked them against the handwritten records of Multiut's bookkeeper, which she testified were accurate. The expert then compared the invoices with Multiut's payment records and calculated interest charges pursuant to a provision in the agreement to arrive at

a damage figure of roughly $15.3 million as of Octo-
ber 2004. Multiut and Draiman object to the expert's
calculation because it rested on documents other than
the Exhibit Bs, though they simultaneously concede that
"[t]he parties were free to depart from the procedures
contemplated by the written contract and . . . then rely on
their contemporaneous notes to confirm each other's
record of quantities or price." Reply Br. 10. The parties
through their course of conduct mutually eschewed the
formality of Exhibit Bs; Multiut cannot now hold that
decision against Dynegy in a one-sided fashion. Nor is
there any basis for the argument that Dynegy's damages
computation is flawed because it rests in large part on
Multiut's concededly accurate data rather than Dynegy's
own records.

Multiut and Draiman next contend that even if Dynegy
adequately computed its damages, it should be barred
from recovering them because of its alleged manipula-
tion of gas price indices. Even if the invoices accurately
reflected the prices charged, the argument goes, they
improperly reflected inflated prices and therefore create
a genuine issue of material fact as to the amount that
would have been due had the price indices been left to
the mercy of the invisible hand. Moreover, Multiut and
Draiman continue, Dynegy "bears the burden of proving
that the amounts of the invoices it seeks to collect are
accurate based on free and open market indices." Appel-
lants' Br. 27. The district court rejected these arguments,
finding that "the causal chain that Multiut seeks to
prove is too attenuated and diffuse," and noting, "it
is not clear how damages would apply in that

Multiut's theory is that fraud was perpetrated on the whole marketplace so that the price charged by all suppliers presumably would have been equally affected by the alleged manipulation."

We agree with the sound reasoning of the district court. Multiut and Dynegy's argument has some intuitive appeal, and echoes the equitable doctrine of unclean hands, but there is no evidence in the record from which a reasonable jury could conclude that Dynegy's alleged price manipulation out west so significantly affected the prices it was quoting Multiut in Chicago that it should not be paid for the gas it distributed. Multiut has offered little more than indignant speculation that the prices it was charged were impermissibly inflated. They may well have been. But Multiut has not presented any evidence showing how much they were inflated, what portion of that inflation might reasonably be attributable to Dynegy's alleged misdeeds, or what price it would have been charged had the market been functioning normally. The FERC report, Multiut's only real evidence of the alleged manipulation, focuses predominantly on the western United States, implicates more than a dozen firms, and mentions Chicago and the "Great Lakes" region only twice in roughly 400 pages and never in connection with Dynegy. Multiut makes a logical point, but more than speculation, no matter how righteous, is required to create a genuine issue of material fact. *See Delapaz v. Richardson*, 634 F.3d 895, 901 (7th Cir. 2011); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (noting that nonmoving party "must do more than

simply show that there is some metaphysical doubt as to the material facts").

Multiut and Draiman's final argument against the entry of summary judgment is similar to their previous one. They contend that the invoices are inaccurate and therefore unenforceable because they do not take into account the provisions of three alleged unwritten contracts: an oral "most-favored-nations" contract, an oral fixed-price contract, and an implied-in-fact contract to waive interest. We have already seen, however, that the record does not support the inference that such binding contracts existed. *See supra* Part II.B. If they did not exist, they could not possibly have hampered Dynegy's ability to abide by the concededly valid written agreement.

### 2. Breach of Guaranty

Dynegy also alleged that Multiut and Draiman breached a 1995 guaranty by failing to satisfy the debts Multiut incurred in connection with the agreement. Draiman signed the guaranty in both his official and individual capacities, and he and Multiut concede that it is a valid document. They argue that it should not be enforced against them, however, because Dynegy failed to comply strictly with the agreement's Exhibit B requirements. This argument gets them no further here than it did in connection with Dynegy's breach of contract claim.

A guaranty is a "third party's promise to answer for payment on or fulfill an obligation if the person pri-

marily liable fails to perform." *Panno v. Nicolau*, 529 N.E.2d 95, 98 (Ill. App. Ct. 1988). Multiut and Draiman do not contest that the guaranty here subjects them to liability if Multiut fails to perform its obligations under the agreement; they challenge neither its validity nor scope. We have already determined that Dynegy is entitled to summary judgment on its breach of contract claim; there is no genuine issue as to whether Multiut failed to fulfill its obligations. We recognized Multiut's concern with the lack of Exhibit Bs, but concluded that their absence was no impediment to finding Multiut liable under the contract. *See supra* Part II.C.1. Since Multiut and Draiman do not raise an independent argument or present any independent evidence as to why they should not be held to the terms of the guaranty, we need not continue our analysis beyond this point. They have failed to demonstrate that a material issue of genuine fact exists for trial, so summary judgment is appropriate on this claim.

## D.  Breach of Confidentiality Agreement Counterclaim

In 1997, Dynegy expressed an interest in acquiring Multiut. Multiut was keen on the deal but insisted that Dynegy sign a confidentiality agreement before it would divulge any sensitive information. The confidentiality agreement prohibited Dynegy from disclosing any confidential or proprietary information provided by Multiut without first obtaining Multiut's written consent. The confidentiality agreement further restricted Dynegy's use of the information to "evaluating a Proposed Transaction

between Multiut and [Dynegy]." Dynegy signed the agreement and gained access to Multiut's confidential information, including "contracts, pricing, volumes, and terms" in addition to "customer information." Dynegy copied much of the information and pursued the acquisition for a time, but ultimately decided not to pull the trigger. It opted instead to enter into a joint venture with one of Multiut's competitors, Nicor Inc., a possibility it had been considering while courting Multiut. A handful of high-level executives at Dynegy had at least some involvement with both the Multiut due diligence and the Nicor joint venture. Citing the overlap in staffing, and cases from this court, *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir. 1995), and the Pennsylvania Superior Court, *Den-Tal-Ez, Inc. v. Siemens Capital Corp.*, 566 A.2d 1214 (Pa. Super. Ct. 1989), Multiut contends in one of its many counterclaims that its "confidential information was inevitably disclosed to Dynegy's Nicor Energy subsidiary." This alleged breach of the confidentiality agreement further resulted in Nicor Energy gaining a significant though unquantified competitive advantage over Multiut and wooing its customers away.

The district court did not evaluate Multiut's "inevitable disclosure" arguments, concluding that Multiut could not survive summary judgment even if the doctrine applied because Multiut failed to present any evidence of its damages. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (noting that summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial"). Multiut contends this decision was erroneous because the district court placed too high a burden on it; in its view, "[a]ll Multiut need establish is factual support for the proposition that it suffered an injury in fact." We review the district court's grant of summary judgment de novo, drawing all reasonable inferences in Multiut's favor. *E.g.*, *Davis*, 2011 WL 2611303, at *5.

There is no need to delve into the murky waters of the "inevitable disclosure" doctrine here. Like most of Multiut's other counterclaims, this claim against Dynegy is a standard breach of contract claim. Under Illinois law, plaintiffs alleging breaches of contract "bear[ ] the burden of proving that [they] sustained damages resulting from the breach and establishing both the correct measurement of damages and the final computation of damages based on that measurement." *Ollivier*, 634 N.E.2d at 422; *see also Perfection Corp. v. Lochinvar Corp.*, 812 N.E.2d 465, 470-71 (Ill. App. Ct. 2004) ("The party who seeks damages has the burden not only to establish that he sustained damages, but also to establish a reasonable basis for computation of those damages."). Assuming there was a breach—Multiut has not presented any evidence beyond its assertion that Dynegy "inevitably disclosed" information it obtained pursuant to the confidentiality agreement—Multiut has not carried this burden.

It is a bedrock principle that "[d]amages may not be awarded on the basis of speculation and conjecture."

*Perfection Corp.*, 812 N.E.2d at 471. Yet the only evidence Multiut has that it was damaged, let alone how much or by whom, is unspecified "indications from the market or from its customers that Nicor Energy always seemed to know what Multiut could offer and then undercut that price." No admissible evidence puts even a ballpark figure on the damages Multiut endured. And even if we assume Multiut lost profits as a result of a breach of the confidentiality agreement, Draiman testified that he did not know how many customers left Multiut to do business with Nicor Energy. He further acknowledged that numerous other factors, including his brother, Yehuda; customer relations issues; and changes in customer ownership contributed to Multiut's weakened presence in the Chicago natural gas market. Without something linking Multiut's downfall to Dynegy's divulgence or inappropriate use of information in violation of the confidentiality agreement, there is no issue warranting trial on this claim.

### E.  Robinson-Patman Price Discrimination Counterclaim

Multiut and Draiman's final counterclaim alleges that Dynegy violated section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a), by charging Multiut more for gas than it charged Nicor Energy. They point to price differentials of up to ten cents per therm and contend that Multiut was injured by them. Proceeding under section 4 of the Clayton Act, 15 U.S.C. § 15, they seek treble damages and attorneys' fees. The district court

found that Multiut and Draiman failed to offer any evidence that Multiut suffered injury and therefore granted summary judgment in Dynegy's favor even though it was not persuaded by Dynegy's other arguments. We review this determination de novo, drawing all reasonable inferences in Multiut and Draiman's favor. *E.g., Davis*, 2011 WL 2611303, at *5.

"Section 2(a) of the Robinson-Patman Act makes it illegal to discriminate in price when an injury to competition is the consequence." *Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 41 (7th Cir. 1992) (citation omitted). It is a "prophylactic statute which is violated merely upon a showing that 'the effect of such discrimination *may be* substantially to lessen competition." *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 561 (1981) (quoting 15 U.S.C. § 2(a)). To establish the "secondary-line"[2] violation of which they complain, Multiut and Draiman must show (1) that Dynegy's sales of natural gas to Multiut and Nicor Energy were made

---

[2]  There are three categories of competitive injury that may give rise to Robinson-Patman Act claims: "primary line," "secondary line," and "tertiary line." Primary-line cases involve price discrimination that injures competition at the level of the discriminating seller and its direct competitors. Secondary-line cases like this one involve price discrimination that injures competition among customers of the discriminating seller. Tertiary-line cases involve injury to competition among the customers of the differently treated purchasers. *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 176 (2006).

in interstate commerce; (2) that the gas was of like grade and quality; (3) that Dynegy discriminated in price between Multiut and Nicor Energy; and (4) that the discrimination may have injured competition, to Nicor Energy's advantage. *See Volvo Trucks*, 546 U.S. at 176-77 (citing 15 U.S.C. § 13(a)); *Texaco Inc. v. Hasbrouck*, 496 U.S. 543, 556 (1990) (same); *see also* ABA Section of Antitrust Law, 1 *Antitrust Law Developments* 490 (6th ed. 2007) ("Proof of a violation under Section 2(a) requires (1) a difference in price, (2) in sales to two buyers purchasing from a single seller, (3) involving commodities, (4) of like grade and quality, (5) that may injure competition."). The "competitive injury" prong of this showing may be inferred from evidence that a favored competitor received significantly better prices over an extended period of time; the hallmark of such injury "is the diversion of sales or profits from a disfavored purchaser to a favored purchaser." *Volvo Trucks*, 546 U.S. at 177.

But mere demonstration of a "competitive injury" and the other elements of a violation "does not mean that a disfavored purchaser has been actually 'injured' within the meaning of § 4 [of the Clayton Act]." *J. Truett Payne Co.*, 451 U.S. at 562. Plaintiffs (here, counterplaintiffs) seeking to recover treble damages pursuant to 15 U.S.C. § 15 "must prove more than a violation of § 2(a), since such proof establishes only that injury *may* result." *Id.*; *cf. Texaco*, 496 U.S. at 572 (noting distinction between liability and damages issues in the Robinson-Patman context). The burden of showing damages is not "unduly rigorous," *Texaco*, 496 U.S. at 573 (quoting *J. Truett Payne Co.*, 451 U.S. at 562), but plaintiffs must present some

evidence of injury attributable to the price discrimination, *see Falls City Indus., Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 437 (1983); *J. Truett Payne Co.*, 451 U.S. at 568 ("[I]f there has been a violation of the Robinson-Patman Act, petitioner is not excused from its burden of proving antitrust injury and damages. It is simply that once a violation is established, that burden is to some extent lightened."). As on their breach of confidentiality agreement counterclaim, Multiut and Draiman have failed to satisfy this obligation.

Multiut and Draiman devote much of their briefing on this issue to an argument that they established a prima facie violation of the Robinson-Patman Act. The district court rejected Dynegy's arguments for summary judgment on those grounds, however, so we are unsure why Multiut and Draiman have pursued this line of argument at the expense of attempting to establish an actual injury resulting from Dynegy's alleged price discrimination, an argument to which they dedicate a mere five sentences between their opening and reply briefs. In those five sentences, Multiut and Draiman contend that they have "identified evidence of lost sales and profits resulting from Dynegy's price discrimination." They do not, however, give any indication of what that evidence was, or how it tied to Dynegy's actions. We assume they are referring to the $5 million lost profits figure reported only in the properly excluded Draiman declaration, and their expert's computation that the long-term difference in prices charged amounted to roughly $1.86 million, even though the expert expressly testified that he did no work relating to the Robinson-

Patman counterclaim and, moreover, such computation is insufficient evidence of damages. *See Texaco*, 496 U.S. at 551. Even if Multiut and Draiman are able to ultimately prove that Dynegy violated the Robinson-Patman Act, they have not presented admissible evidence from which a jury could find that Multiut was injured as a result. The district court properly entered summary judgment on this counterclaim. *See Celotex*, 477 U.S. at 322.

## F.  Denial of Second Motion to Reconsider

After we dismissed Multiut and Draiman's first appeal for lack of jurisdiction, the case returned to the district court and both sides submitted briefing on the proper computation of prejudgment interest. While the district court was considering that issue, Multiut and Draiman filed a motion asking the district court to reconsider its summary judgment rulings. They recognized that the district court had denied their previous motion to reconsider, but asserted that new evidence they obtained in connection with their multi-district litigation action against Dynegy rendered the grants of summary judgment inappropriate. The new evidence included an affidavit and a memorandum from former Dynegy employee Jeffrey Hornback, which demonstrated that Dynegy was aware of the alleged price index manipulation while it was contracting with Multiut, and an affidavit from Dr. Michael Harris, an economist who reviewed the FERC report and concluded that manipulation of the gas price indices out west would have impacted prices in Chicago.

The district court ordered briefing on the motion to reconsider but denied it (and its accompanying evidentiary submissions) without reaching the merits. In doing so, the district court first cited concerns of finality and noted that it had already visited the issue of price index manipulation at least twice. The district court gave as an alternative ground the limited scope of the mandate we issued, which instructed the district court only to determine prejudgment interest. The district court reasoned, "[i]t would be contrary to the spirit of [the mandate] to construe it as an open invitation to allow the parties to delve back into the substantive issues of the case, issues that were the subject of the appeal in the first place."

Multiut and Draiman now contend that the district court erred in disregarding their new evidence and denying their motion. But they do not challenge either of the district court's asserted bases for denying their motion. Instead, they assert that the district court "should have reconsidered its summary judgment ruling in light of the Hornback and Harris affidavits." They then walk us through the evidence and reiterate that the evidence was not in their possession when summary judgment briefs were filed. These "arguments" do not get them very far, as they have failed to articulate a ground on which we could find that the district court abused its discretion. The district court did not deny their motion because the evidence was not "newly discovered," or because it failed to find a nexus between the evidence and the summary judgment motion; it denied it for other grounds that Multiut and Draiman

wholly disregard. "We cannot make a party's arguments for him, or force him to make arguments he seems determined not to raise." *United States v. Foster*, 577 F.3d 813, 816 (7th Cir. 2009). Multiut and Draiman have waived any relevant argument. We affirm the district court's denial of their motion to reconsider.

## III. Conclusion

The district court appropriately granted summary judgment in Dynegy's favor on its two claims. It was also correct to grant summary judgment in Dynegy's favor on Multiut's barrage of counterclaims. The district court also stayed well within the bounds of its discretion when it excluded the Draiman declaration, and Multiut and Draiman failed to argue that the court stepped over the line in resolving their second motion to reconsider for the reasons it did. We AFFIRM the district court's judgment in full.